ERIC B. EVANS (State Bar No. 232476)
Email: eevans@ktslaw.com
KILPATRICK TOWNSEND & STOCKTON LLP
1302 El Camino Real, Suite 175
Menlo Park, California 94025
Telephone:(650) 326-2400
Facsimile: (650) 325-2422

GWENDOLYN C. PAYTON (*pro hac vice* to be filed)
Email: gpayton@ktslaw.com
JOHN NEELEMAN (*pro hac vice* to be filed)
Email: jneeleman@ktslaw.com
KILPATRICK TOWNSEND & STOCKTON LLP
1420 Fifth Avenue, Suite 3700
Seattle, Washington 98101
Telephone:(206) 467-9600
Facsimile: (206) 623-6793

*Attorneys for Plaintiff*
NEW HOPE BOTANICALS, LLC

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**EASTERN DIVISION**

| | |
|---|---|
| NEW HOPE BOTANICALS, LLC, a California limited liability company<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DRUG ENFORCEMENT ADMINISTRATION; TERRANCE C. COLE, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR; AND UNITED STATES DEPARTMENT OF JUSTICE,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Complaint Filed August 31, 2026<br>Courtroom:<br>Honorable<br><br>**DEMAND FOR JURY TRIAL**<br><br>**ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF** |

## NATURE OF THE ACTION

1. This action asks the Court to resolve an urgent interpretive uncertainty created by the Drug Enforcement Administration's temporary scheduling order for mitragynine pseudoindoxyl (also known as pseudoindoxyl or MP), MGM-15, and MGM-16 (the "Temporary Scheduling Order"), attached as Exhibit A. DEA signed the order on August 24, 2026, filed it with the Office of the Federal Register that day as FR Doc. 2026-17429, and published it on August 26, 2026. Schedules of Controlled Substances: Temporary Placement of Mitragynine Pseudoindoxyl, MGM-15, and MGM-16 in Schedule I, 91 Fed. Reg. 54,948 (Aug. 26, 2026).

2. Plaintiff does not ask the Court, in the first instance, to invalidate the Temporary Scheduling Order.

3. Plaintiff seeks a declaration under the Declaratory Judgment Act and Federal Rule of Civil Procedure 57 that the Temporary Scheduling Order does not apply to traditional botanical kratom products merely because modern testing may detect naturally occurring or naturally formed trace amounts of pseudoindoxyl. For purposes of this Complaint, "traditional botanical kratom" means powder and extract that maintain the same alkaloid ratios as those found in the natural plant, that have not been intentionally synthesized, isolated, enriched, fortified, or dosed with pseudoindoxyl, and that contain at least 100 parts mitragynine for every 1 part of combined 7-OH and pseudoindoxyl.

4. This interpretation gives effect to the Temporary Scheduling Order's public-safety purpose while avoiding the needless criminalization of natural botanical material that DEA and HHS did not appear to target. In addition, it gives effect to DEA's statement that the Temporary Scheduling Order is "directed at deliberately manufactured and concentrated opioid products, not traditional botanical kratom." U.S. Department of Justice, Office of Public Affairs, *Justice Department Announces Emergency Scheduling of Three Potent Opioid Compounds,* August 25, 2026, available at https://www.justice.gov/opa/pr/justice-department-

announces-emergency-scheduling-three-potent-opioid-compounds ("DOJ Press Release"), attached hereto as Exhibit B.

5. The interpretive question exists because the agencies' public statements point in one direction while the unqualified chemical listing in the Temporary Scheduling Order can be read to point in another. In the DOJ Press Release and other public statements, DEA and HHS announced an emergency response to dangerous synthetic, enhanced, and concentrated kratom-related products, not a federal ban on traditional botanical kratom. See Exhibit B. Yet the Temporary Scheduling Order, if read without the context supplied by DEA's and HHS's own public statements, could be asserted to reach traditional botanical kratom containing only trace pseudoindoxyl that arises from the plant's chemistry or ordinary post-harvest handling. Plaintiff seeks clarification before businesses, consumers, researchers, and laboratories face uncertain criminal, civil, and administrative exposure.

6. For example, DEA's earlier July 1, 2026, press release, attached hereto as Exhibit C, described notices of intent to issue temporary scheduling orders directed at "synthetic 7-OH" (short for 7-hydroxymitragynine, a chemical that occurs in trace amounts in leaf kratom but can also be made synthetically) and "three related substances"—that is, pseudoindoxyl, MGM-15, and MGM-16. The press release quoted the Administrator as stating that "[t]oday's action targets highly concentrated, synthetic 7-OH products, which pose a growing threat to public safety and health." A copy of the notice of intent to issue a temporary scheduling order for 7-OH ("7-OH Notice") is attached as Exhibit D. As the 7-OH Notice explained, the specified threshold applies to "[a]ny botanical material of the plant Mitragyna speciosa, also known as kratom, and contains more than 0.050 percentage of 7-hydroxymitragynine on a dry weight basis." Ex. D, 91 Fed. Reg. 40,917 (July 6, 2026).

7. The DEA's press release accompanying the 7-OH Notice further stated that the companion 7-OH Notice "does not apply to botanical kratom products that contain naturally occurring 7-OH below the specified threshold" and "targets

synthesized products and those containing elevated concentrations of 7-OH as outlined in the temporary scheduling order." Ex. C. Those statements confirm the agencies' publicly announced line: concentrated, synthetic, and enhanced products are the problem; traditional botanical kratom with trace amounts of 7-OH, pseudoindoxyl, or MGM below an objective threshold is not.

8. HHS and FDA made the same point in their contemporaneous press release, attached hereto as Exhibit E, which was titled "HHS, FDA Commend DEA Action Against Dangerous Enhanced 7-OH Products." HHS and FDA stated that "[t]hese actions are not intended to regulate natural leaf kratom that does not contain enhanced levels of 7-OH," and further explained that "[a]lthough 7-OH occurs naturally in trace amounts in the kratom plant, scheduling 7-OH above a certain threshold level does not intend to capture the kratom botanical leaf in the present temporary scheduling recommendation." The 7-OH Notice reinforces that intent, explaining that DEA's action responds to "[t]his ... shift from traditional botanical use to aggressive marketing of highly concentrated opioid products in the United States." Ex. D, 91 Fed. Reg. at 40,919. The release also distinguished the pseudoindoxyl/MGM substances by describing pseudoindoxyl as "a chemical rearrangement product of 7-OH" and MGM-15 and MGM-16 as "synthetic derivatives of 7-OH." Read together, those statements show that DEA and HHS were drawing a practical regulatory line between traditional botanical kratom and deliberately enhanced, synthetic, or concentrated products.

9. The Temporary Scheduling Order can and should be interpreted consistently with the DEA's twice-announced regulatory position. Even if DEA and HHS assumed that pseudoindoxyl or the MGM substances do not occur in traditional botanical kratom, the agencies' public statements still show that their target was synthetic or enhanced opioid products rather than unenhanced botanical material. If analytical evidence shows that trace pseudoindoxyl can be detected in traditional botanical kratom, that evidence creates an ambiguity about the Temporary Scheduling

Order's reach; it does not transform traditional botanical kratom into the high-potency products that motivated emergency action. A declaration excluding traditional botanical kratom from the Temporary Scheduling Order would therefore clarify the agencies' stated intent rather than frustrate it.

10. That interpretation leaves the Temporary Scheduling Order fully viable and enforceable against the products DEA and HHS identified. DEA remains able to control "deliberately manufactured and concentrated opioid products"—intentionally synthesized, isolated, enriched, fortified, or concentrated pseudoindoxyl, MGM-15, MGM-16, and products engineered or marketed to deliver enhanced opioid effects. Ex. B.

11. Plaintiff does not challenge DEA's authority to address those products, and it does not seek an order immunizing synthetic derivatives, enhanced 7-OH products, or concentrated pseudoindoxyl formulations. In the first instance, it seeks only a declaration confirming the DOJ Press Release's statement that traditional botanical kratom products are outside the Temporary Scheduling Order when their only relevant feature is naturally occurring or naturally formed trace pseudoindoxyl/MGM chemistry.

12. The interpretive principle is familiar in controlled-substances law. The Controlled Substances Act ("CSA") and DEA's schedules can distinguish dangerous controlled plant material and derivatives from ordinary plant-derived matter that Congress or DEA has not chosen to control. For example, the CSA at 21 U.S.C. § 802(19) defines "opium poppy" as the plant Papaver somniferum L. "except the seed thereof," and defines "poppy straw" as all parts of the opium poppy after mowing "except the seeds"; DEA's Schedule II regulation likewise controls opium poppy and poppy straw, not poppy seeds as such. The analogy does not depend on treating poppy seeds and kratom as chemically identical. It merely shows that a controlled-substances regime can target the hazardous material Congress or the agency identified without

sweeping ordinary plant matter into criminal control merely because trace residue or related chemistry may be detectable.

13. This interpretation claim also resolves potential concerns regarding 21 U.S.C. § 811(h)(6)'s statement that temporary scheduling orders are not subject to judicial review. Plaintiff does not ask the Court to conduct ordinary judicial review of the Temporary Scheduling Order in the first instance. It asks the Court to declare the legal relations of the parties and construe the Temporary Scheduling Order's scope in light of the text, context, agency statements, and the settled principle that ambiguous criminal or quasi-criminal regulatory commands should be read with precision before regulated parties are forced to choose between compliance paralysis and enforcement risk. Declaratory relief will remove uncertainty while preserving the temporary order's lawful operation against the synthetic and enhanced products that the agencies identified.

14. Only if the Temporary Scheduling Order is interpreted to reach traditional botanical kratom does Plaintiff's alternative validity challenge arise. In that event, the Temporary Scheduling Order is invalid as applied to traditional botanical kratom because DEA did not make the findings Congress required for that category, did not analyze the history or current pattern of abuse, the scope, duration, and significance of abuse, or the public-health risk presented by trace pseudoindoxyl in traditional botanical kratom, and did not explain why a threshold-based line adequate for 7-OH was unavailable for pseudoindoxyl. Those alternative claims preserve Plaintiff's statutory, APA, nonstatutory ultra vires, and constitutional objections without making invalidation the Court's first or preferred path.

15. Clarification best serves public safety, regulatory coherence, and the makers, sellers, researchers, laboratories, and users of traditional botanical kratom who need to know what federal law requires. A declaration excluding traditional botanical kratom from the Temporary Scheduling Order would protect the public by leaving DEA's emergency tools focused on enhanced, concentrated, and synthetic

opioid products. It would also avoid forcing responsible botanical businesses to withdraw from testing, quality control, commerce, and research because the legal effect of trace detection remains uncertain. If DEA wishes to regulate traditional botanical kratom through a threshold or other objective standard, the appropriate course is reasoned agency clarification, not an ambiguous emergency order that regulated parties must interpret at their peril.

## PARTIES

16. Plaintiff New Hope Botanicals, LLC ("New Hope Botanicals") is a California limited liability company with its principal place of business in California. New Hope Botanicals licenses others to manufacture, package, test, distribute, and sell traditional botanical kratom products according to its specifications, specifically its Optimized Plant Mediated Solutions ("O.P.M.S.") brand products, including its Silver product line of powder and capsules, and its Black, Gold, and Red product lines of traditional botanical kratom extracts in capsule and liquid form. O.P.M.S. products do not include synthesized, isolated, enriched, fortified, or added pseudoindoxyl. As with all traditional botanical kratom products, validated testing has detected or may detect trace amounts of pseudoindoxyl and 7-hydroxymitragynine in some O.P.M.S. products. These trace amounts of pseudoindoxyl and 7-hydroxymitragynine are not bioavailable and do not cause measurable effects in the human body. The challenged order directly regulates New Hope Botanicals' own products and conduct.

17. Defendant Drug Enforcement Administration is a component of the United States Department of Justice with its headquarters at 700 Army Navy Drive in Arlington, Virginia 22202. The Attorney General has delegated to DEA authority to administer the CSA, including temporary scheduling authority under 21 U.S.C. § 811(h). 28 C.F.R. § 0.100.

18. Defendant Terrance C. Cole is the Administrator of DEA and is sued in his official capacity with a primary office at DEA headquarters at 700 Army Navy Drive in Arlington, Virginia 22202. He signed the July 6, 2026, notice of intent and

signed the Temporary Scheduling Order on August 24, 2026, which DEA published in the Federal Register on August 26, 2026. Ex. A, 91 Fed. Reg. at 54,956.

19. Defendant United States Department of Justice is the executive department of which DEA is a component with its headquarters at 950 Pennsylvania Avenue NW, Washington, D.C. 20530.

## STATUTORY AND REGULATORY FRAMEWORK

20. The CSA ordinarily permits DEA to add a substance to a schedule by rule after receiving a scientific and medical evaluation and recommendation from the Department of Health and Human Services and following the procedures prescribed in 21 U.S.C. § 811(a)-(c).

21. Section 811(h) creates an expedited exception. DEA may temporarily place a substance in Schedule I only if it finds that temporary scheduling is "necessary to avoid an imminent hazard to the public safety." 21 U.S.C. § 811(h)(1).

22. In making the imminent-hazard finding, DEA must consider the substance's history and current pattern of abuse; the scope, duration, and significance of abuse; and the risk, if any, to public health. 21 U.S.C. §§ 811(c)(4)-(6), (h)(3). The inquiry includes actual abuse, diversion from legitimate channels, and clandestine importation, manufacture, or distribution. *Id.* § 811(h)(3).

23. Congress made the required analysis specific to the drug or substance being controlled. Section 811(c) requires DEA to consider the statutory factors "with respect to each drug or other substance," and § 812(b) requires the Schedule I findings to be made with respect to the drug or substance placed in the schedule.

24. Before issuing a temporary order, DEA must publish at least 30 days' notice in the Federal Register of its intention to issue the order "and the grounds upon which such order is to be issued." 21 U.S.C. § 811(h)(1)(A).

25. A temporary listing lasts two years and may be extended for up to one additional year during permanent-scheduling proceedings. 21 U.S.C. § 811(h)(2). It therefore may govern an industry for as long as three years.

26. The operative listings are 21 C.F.R. § 1308.11(h)(89)-(91), added by the Temporary Scheduling Order for mitragynine pseudoindoxyl (Drug Code 9672), MGM-15 (Drug Code 9673), and MGM-16 (Drug Code 9674). Ex. A, 91 Fed. Reg. at 54,956. The final listings contain no concentration, per-article, botanical, manufacturing, or de minimis threshold or exception. The introductory language of § 1308.11(h) therefore covers "any material, compound, mixture or preparation which contains any quantity" of any listed substance, so the presence of any detectable quantity of pseudoindoxyl or an MGM substance controls the entire material, mixture, or preparation.

27. DEA demonstrated in its companion 7-OH action that it can define a temporarily controlled substance by concentration, product category, and per-article quantity. The 7-OH Notice explained that the specified threshold applies to "[a]ny botanical material of the plant Mitragyna speciosa, also known as kratom, and contains more than 0.050 percentage of 7-hydroxymitragynine on a dry weight basis." 91 Fed. Reg. at 40,917. The proposed 7-OH listing thus distinguishes raw botanical material from synthetic and processed products and applies only above specified thresholds. 91 Fed. Reg. at 40,917-18.

28. Schedule I placement triggers stringent registration, security, recordkeeping, import, export, manufacturing, distribution, research, and disposal requirements. Persons who handle a Schedule I substance without the required authorization face seizure and forfeiture and potential administrative, civil, and criminal sanctions.

29. The order asserts that § 811(h) directs agency action by order rather than rule, so notice and comment under the Administrative Procedure Act, 5 U.S.C. § 553, does not apply. Ex. A, 91 Fed. Reg. at 54,955-56. Alternatively, DEA invoked good cause under 5 U.S.C. § 553(b)(B), asserting that further delay would be "impracticable and contrary to the public interest." Ex. A, 91 Fed. Reg. at 54,956. DEA further deems the action not a "rule" for purposes of the Regulatory Flexibility Act and not a

significant regulatory action under Executive Order 12866. Ex. A, 91 Fed. Reg. at 54,956. The order also asserts that "[t]emporary scheduling orders are not subject to judicial review" under 21 U.S.C. § 811(h)(6), while permanent scheduling decisions are reviewable under 21 U.S.C. § 877. Ex. A, 91 Fed. Reg. at 54,954.

## JURISDICTION, REVIEWABILITY, AND VENUE

30. This action arises under the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq*.; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706; and the Fifth Amendment to the United States Constitution. The Court has federal question jurisdiction under 28 U.S.C. § 1331.

31. The United States has waived sovereign immunity for claims seeking relief other than money damages from unlawful agency action. 5 U.S.C. § 702. The Court may award declaratory relief under 28 U.S.C. §§ 2201-2202 and equitable relief under the APA, 5 U.S.C. §§ 705-706, and its traditional equitable authority.

32. In the first instance, Plaintiff seeks a declaration that the Temporary Scheduling Order does not apply to traditional botanical kratom products. In the alternative, it seeks to challenge the validity of the Temporary Scheduling Order.

33. Plaintiff recognizes that 21 U.S.C. § 811(h)(6) provides that an order issued under § 811(h)(1) is generally not subject to judicial review. DEA has now affirmatively asserted in the order itself that "[t]emporary scheduling orders are not subject to judicial review." Ex. A, 91 Fed. Reg. at 54,954. That assertion sharpens rather than resolves the antecedent-authority question Plaintiff presents. Plaintiff contends that § 811(h)(6) does not foreclose judicial determination of whether the challenged action satisfied the statutory conditions precedent to the exercise of that authority, including Congress's requirement that temporary scheduling be necessary to avoid an imminent hazard to the public safety and that DEA consider the prescribed statutory factors with respect to the substance and scope of the control actually imposed.

34. In the further alternative, Plaintiff asserts a claim under the Due Process Clause of the Fifth Amendment. Section 811(h)(6) contains no clear statement foreclosing constitutional review, and Plaintiff therefore seeks review of its constitutional claims independently of any claim arising under the Administrative Procedure Act.

35. If the Court concludes that the Administrative Procedure Act affords no cause of action, in the further alternative, Plaintiff seeks nonstatutory equitable relief to the limited extent available where an agency acts beyond the authority Congress delegated or contrary to a clear statutory limitation.

36. Section 811(h)(6) and 21 U.S.C. § 877 create a substantial forum question. Section 877 commits review of final DEA determinations under the CSA to the courts of appeals, while § 811(h)(6) bars direct review of a temporary order. If this Court concludes that any claim belongs exclusively in a court of appeals, Plaintiff requests transfer rather than dismissal under 28 U.S.C. § 1631.

37. Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(C) because Plaintiff New Hope Botanicals resides in this District, no real property is involved in the action, and every Defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States.

38. The Temporary Scheduling Order has now been signed and published. Plaintiff nevertheless presented the scientific issue to DEA before issuance. Although Plaintiff and other interested parties submitted written materials, the order confirms that DEA conducted no public comment process and responded only to the HHS letter under § 811(h)(4); it also confirms that no administrative hearing or ordinary comment process was available for the temporary scheduling order. Ex. A, 91 Fed. Reg. at 54,956. No further administrative remedy is available or required.

## FACTUAL ALLEGATIONS

### A. DEA and HHS described the federal action as targeting enhanced and synthetic products, not traditional botanical kratom.

39. On July 1, 2026, DEA announced that it had filed notices of intent to temporarily place 7-OH above a specified threshold and three 7-OH-related substances—mitragynine pseudoindoxyl, MGM-15, and MGM-16—into Schedule I. DEA stated that HHS had confirmed "synthetic 7-OH, and the three related substances" had no accepted medical use and a high potential for abuse. DEA also quoted its Administrator as saying that "[t]oday's action targets highly concentrated, synthetic 7-OH products, which pose a growing threat to public safety and health." *See* Ex. C. Critically, the 7-OH Notice explained that DEA was targeting a shift away from traditional botanical use, observing that "[t]his is a shift from traditional botanical use to aggressive marketing of highly concentrated opioid products in the United States." Ex. D, 91 Fed. Reg. at 40,919.

40. DEA then expressly distinguished traditional botanical kratom from the products it sought to control. The 7-OH Notice acknowledged that "[i]n its natural botanical form, 7-hydroxymitragynine makes up less than two percent of the total alkaloid content or occurs in trace amount in M. speciosa," Ex. D, 91 Fed. Reg. at 40,918, and that the 7-OH temporary scheduling action "does not apply to botanical kratom products that contain naturally occurring 7-OH below the specified threshold." DEA explained that the action instead "targets synthesized products and those containing elevated concentrations of 7-OH as outlined in the temporary scheduling order," and noted that commercial products often contain higher amounts of 7-OH than is found in traditional botanical kratom. *See* Ex. C.

41. HHS and FDA used the same distinction. Their July 1, 2026, press release stated that "[t]hese actions are not intended to regulate natural leaf kratom that does not contain enhanced levels of 7-OH," and that "scheduling 7-OH above a certain threshold level does not intend to capture the kratom botanical leaf in the present

temporary scheduling recommendation." The release identified MP as a chemical rearrangement product of 7-OH and MGM-15 and MGM-16 as synthetic derivatives of 7-OH, thereby describing the pseudoindoxyl/MGM action against the same background: agencies focused on enhanced, concentrated, synthetic, or derivative products, not traditional botanical kratom. *See* Ex. E.

42. Those official statements support a coherent reading of the Temporary Scheduling Order. DEA and HHS may well have believed that traditional botanical kratom would never contain pseudoindoxyl, just as they recognized that 7-OH occurs naturally only in trace amounts and therefore required a threshold for 7-OH. If that assumption proves incomplete because improved analytical chemistry detects trace pseudoindoxyl in traditional botanical kratom, the appropriate judicial response is to clarify the Temporary Scheduling Order's scope in harmony with the agencies' stated purpose. The Temporary Scheduling Order remains enforceable against intentionally synthesized, isolated, enriched, fortified, concentrated, or enhanced products while excluding traditional botanical kratom that does not belong to that product category.

**B. Traditional botanical kratom and the mitragynine pathway.**

43. Kratom is the common name for botanical material derived from Mitragyna speciosa, a tree indigenous to Southeast Asia. Kratom leaf contains a complex matrix of naturally occurring alkaloids, of which mitragynine is typically the most abundant.

44. Mitragynine, 7-OH, and pseudoindoxyl are chemically related. Mitragynine may undergo oxidation to 7-OH; 7-OH may in turn rearrange or convert to pseudoindoxyl. Those transformations are known to occur metabolically in vivo, and they may also occur outside the body, producing trace pseudoindoxyl without intentional synthesis or fortification.

45. Those transformations are not confined to the body or to a factory. In a peer-reviewed 1974 study, mitragynine incubated with a common plant-associated fungus was converted into pseudoindoxyl, demonstrating that a biological system can

produce the molecule with no human synthetic step. Recent research at the University of Florida's College of Pharmacy also establishes that 7-OH rearranges into pseudoindoxyl under acidic conditions through a well-characterized reaction (a semi-pinacol rearrangement, in which the molecule's own atoms reorganize into the pseudoindoxyl structure). Researchers have also long documented that storage, transportation, humidity, and microbial exposure after harvest can materially change the alkaloid content of kratom leaf.

46. Recent peer-reviewed stability testing confirms that the conversion occurs spontaneously. University of Mississippi researchers found 7-OH to be chemically unstable: in a pH-neutral water buffer, more than twenty percent of it was consumed within eight days, with roughly ten percent converting into mitragynine pseudoindoxyl, and comparable conversion occurred under mildly alkaline conditions within forty-eight hours. Pseudoindoxyl can therefore appear in traditional botanical kratom through ordinary handling and shelf time, without synthesis, enrichment, or fortification.

47. The same molecules can also be produced deliberately by manufacturers. Manufacturers can purify mitragynine or 7-OH and use chemical processes to create, isolate, enrich, or concentrate pseudoindoxyl. Such products can deliver pseudoindoxyl in amounts and formulations radically different from traditional botanical kratom.

48. Pseudoindoxyl's molecular identity alone does not reveal whether it was deliberately manufactured or instead appears at a trace level through the botanical material's natural chemistry or ordinary, non-synthetic handling. Concentration, alkaloid profile, product form, processing history, and validated analytical evidence can distinguish those categories.

49. The public-health evidence concerning deliberately manufactured pseudoindoxyl products does not establish that trace pseudoindoxyl in a traditional botanical matrix has the same dose, exposure, use pattern, or risk profile.

50. The concentrations involved differ by orders of magnitude. In accredited laboratory testing of unprocessed kratom leaf and botanical powder, pseudoindoxyl was present at 2.6 to 14.3 micrograms per gram (parts per million) and represented a median of 0.023 percent of the total major alkaloids measured. By contrast, laboratory analysis of the concentrated products that prompted DEA's action found pseudoindoxyl at up to 8.4 milligrams per serving in liquid formulations, and two products advertised 9.0 and 10.0 milligrams per serving on their labels. Trace pseudoindoxyl carried in a botanical matrix and a product deliberately dosed with pseudoindoxyl do not present the same exposure.

**C. Modern analytical methods reveal a distinction DEA did not consider.**

51. Accurate identification of pseudoindoxyl in kratom is analytically demanding. Pseudoindoxyl and related kratom alkaloids have similar or identical nominal masses and may produce overlapping chromatographic peaks or mass spectral transitions. A method that relies on mass or a common transition alone may misidentify another compound as pseudoindoxyl.

52. The July 6, 2026 Pseudoindoxyl/MGM Notice acknowledged that the paucity of reported pseudoindoxyl seizures may be due to a lack of readily available analytical reference standards and other analytical challenges, that laboratories need time to develop and validate methods, and that accurate identification requires specific methods and instrumentation. Pseudoindoxyl/MGM Notice, 91 Fed. Reg. at 40,913. The Temporary Scheduling Order carries those statements forward. Ex. A, 91 Fed. Reg. at 54,952.

53. Until very recently, available routine testing could not reliably detect trace pseudoindoxyl. The practical result was that traditional botanical kratom appeared to contain no pseudoindoxyl even though trace quantities were present or naturally formed below the capabilities of then-prevailing methods. New Hope Botanicals and its experts have now developed more sensitive testing protocols that can detect trace amounts.

54. One ISO/IEC 17025-accredited independent laboratory uses liquid chromatography with tandem mass spectrometry (a technique that first separates compounds in time and then identifies each by the fragments into which it breaks), validated in accordance with USP General Chapter 1225, with linearity of R-squared = 0.9968 across 0.1 to 50 parts per billion, accuracy of 97.0 to 103.4 percent in leaf powder, and repeatability of 3.32 to 4.54 percent in leaf powder. Because pseudoindoxyl and 7-OH are isomers that share the same nominal mass, the method separates them by approximately 5.8 minutes of retention time, determines each on its own precursor ion, and confirms pseudoindoxyl by three additional qualifier-ion ratios. Every reported result was a quantified value above the limit of quantitation for that sample, not an estimated or trace-level assignment.

55. Testing under that method found trace amounts of pseudoindoxyl in traditional botanical kratom, including in samples with documented chain of custody and no intentional synthesis, isolation, enrichment, fortification, or addition of pseudoindoxyl.

56. That testing found pseudoindoxyl in all fifty-five kratom samples submitted, a one-hundred-percent detection rate spanning unprocessed leaf, botanical powder, capsules, liquid shots, and extracts, at concentrations from 0.60 to 354.0 micrograms per gram with a median of 33.6 micrograms per gram. All ten unprocessed leaf and botanical powder samples, material subjected only to drying and to no extraction, concentration, or manufacturing step of any kind, returned quantifiable pseudoindoxyl at 2.6 to 14.3 micrograms per gram, across seven commercial leaf varieties and red-, white-, and green-vein designations. The compound is therefore present in the leaf before any human processing begins.

57. The distribution of those results is itself evidence that the pseudoindoxyl is native rather than added. Pseudoindoxyl rose and fell with the plant's other alkaloids, correlating with 7-OH at 0.92 and with mitragynine at 0.79, but always less than proportionally, which is the signature of a secondary byproduct carried along

with the plant's primary chemistry. It also held a stable, minor share of total alkaloid content in every product form, a median of 0.02 to 0.04 percent. A contaminant introduced at a discrete point, such as a single supplier, lot, production line, or handling step, would instead produce a patchy detection pattern; no sample in the set was free of pseudoindoxyl.

58. The measured trace quantities were orders of magnitude below the pseudoindoxyl content of the pills, tablets, and enriched products described in DEA's notice.

59. Independent researchers report the same thing. A federally funded University of Florida laboratory that routinely analyzes marketed kratom informed DEA on July 10, 2026, that it always detects pseudoindoxyl in trace amounts in leaf and leaf-based products using a validated tandem mass spectrometry method, and warned that a no-tolerance limit would create unintended consequences for legitimate kratom products. Peer-reviewed testing published in Phytochemistry likewise detected pseudoindoxyl in 33 of 35 commercial products.

60. These results do not establish that all kratom contains pseudoindoxyl or that every product should be exempt. They establish the narrower point DEA failed to consider: a detectable trace amount no longer proves that the product was synthetically modified or belongs to the high-concentration product category DEA intended to target.

**D. DEA drew a threshold for 7-OH but not for pseudoindoxyl.**

61. On July 6, 2026, DEA published two companion notices of intent under § 811(h): the Pseudoindoxyl/MGM Notice under Docket No. DEA-1644, 91 Fed. Reg. 40,909 (July 6, 2026), and the 7-OH Notice under Docket No. DEA-1570, 91 Fed. Reg. 40,917 (July 6, 2026).

62. In the 7-OH Notice, DEA acknowledged that 7-OH is found naturally in kratom, occurring at less than two percent of total alkaloid content or in trace amounts;

that it can also be synthesized from mitragynine; and that naturally occurring and synthetic 7-OH are chemically identical. Ex. D, 91 Fed. Reg. at 40,918.

63. DEA further recognized that isolated or semi-synthetically derived 7-OH formulations present a distinct public-safety profile when concentrated above a threshold. It therefore proposed to schedule only botanical material containing more than 0.050 percent 7-OH by dry weight and specified synthetic or processed articles containing more than 0.050 percent or more than 1.00 milligram per article. Ex. D, 91 Fed. Reg. at 40,917-18.

64. DEA's 7-OH approach recognizes that a chemical name, standing alone, can sweep together products whose origin, concentration, matrix, use, and risk are materially different. A quantitative and product-specific threshold separates traditional botanical kratom from the concentrated products that prompted emergency action.

65. The Temporary Scheduling Order contains no analogous threshold. The July 6, 2026, Pseudoindoxyl/MGM Notice described an unqualified chemical listing and stated that, unlike mitragynine and 7-OH, pseudoindoxyl is produced through synthetic modification of purified isolates. Pseudoindoxyl/MGM Notice, 91 Fed. Reg. at 40,911. The Temporary Scheduling Order carries those statements forward, stating that "[u]nlike the indole alkaloids mitragynine and 7-hydroxymitragynine, which are naturally occurring in the plant, mitragynine pseudoindoxyl, MGM-15, and MGM-16 are produced through synthetic modifications of purified mitragynine isolates or 7-hydroxymitragynine," Ex. A, 91 Fed. Reg. at 54,951, and now contains the unqualified listings at 21 C.F.R. § 1308.11(h)(89)-(91), Ex. A, 91 Fed. Reg. at 54,956.

66. DEA's July 6, 2026, Pseudoindoxyl/MGM Notice nevertheless acknowledged that pseudoindoxyl was historically isolated as a metabolite from biotransformed mitragynine and that it is an oxidative metabolite of 7-OH. Pseudoindoxyl/MGM Notice, 91 Fed. Reg. at 40,911, 40,913. The Temporary Scheduling Order (Ex. A) carries those statements forward, stating that "[t]he first

mention of mitragynine pseudoindoxyl in scientific literature dates to 1974 when mitragynine pseudoindoxyl was isolated as a metabolite from bio-transformed mitragynine," Ex. A, 91 Fed. Reg. at 54,951, and that "mitragynine pseudoindoxyl is an oxidative metabolite of 7-hydroxymitragynine," Ex. A, 91 Fed. Reg. at 54,952. Neither the Notice nor the order examined whether related transformations may yield trace pseudoindoxyl in botanical material outside the body or whether improved methods can now detect those amounts.

67. The published literature answers the question DEA did not ask. 7-OH is the key intermediate in an acid-mediated rearrangement of mitragynine that yields pseudoindoxyl, and that rearrangement has been observed outside the body in buffer at neutral and alkaline pH. Trace pseudoindoxyl in botanical material is therefore an expected product of the plant's own chemistry and of ordinary post-harvest handling, not proof of a synthetic step.

68. DEA's evidence of an emerging market for synthetic pseudoindoxyl and MGM in the July 6, 2026 Pseudoindoxyl/MGM Notice concerns pseudoindoxyl pills, tablets, liquid shots, and flavored chewable tablets promoted for potent opioid effects. Pseudoindoxyl/MGM Notice, 91 Fed. Reg. at 40,911-13. The Temporary Scheduling Order (Ex. A) carries the same market and forensic evidence forward, describing products "commonly sold in different forms such as powders, tablets, and liquid shots" and "flavored chewable tablets." Ex. A, 91 Fed. Reg. at 54,950; see also Ex. A, 91 Fed. Reg. at 54,952. Neither the Notice nor the Temporary Scheduling Order identifies traditional botanical kratom as the source of the asserted abuse problem.

69. DEA reported pseudoindoxyl identifications in toxicology cases, often together with other kratom alkaloids. Ex. A, 91 Fed. Reg. at 54,952-53. The Pseudoindoxyl/MGM Notice did not establish that trace pseudoindoxyl in traditional botanical kratom caused or materially contributed to any reported overdose, nor did it identify the pseudoindoxyl concentration in traditional botanical kratom products associated with those cases. Pseudoindoxyl/MGM Notice, 91 Fed. Reg. at 40,913. The

Temporary Scheduling Order carries those statements forward and likewise supplies no such analysis.

70. DEA did not analyze the history or current pattern of abuse, the scope or significance of abuse, or the public-health risk of traditional botanical kratom products containing only trace pseudoindoxyl. Instead, it moved from evidence concerning deliberately marketed high-potency products to a chemical listing that reaches any detectable amount in any mixture or preparation.

71. The result is an unexplained—and apparently unintended—asymmetry. DEA adopted a threshold for 7-OH because trace botanical and concentrated synthetic forms are chemically identical but materially different as products. It refused to consider the same regulatory distinction for pseudoindoxyl because of a factual premise that modern analytical evidence disproves or, at minimum, materially qualifies.

72. The scientists whose work informs DEA's own record urged the agency to close that gap. Pinney Associates, whose Controlled Substances Act eight-factor analyses DEA and FDA have relied upon, supported scheduling concentrated 7-OH but told the agencies that the same threshold approach should be applied to pseudoindoxyl, which has been detected in natural leaf-based products, particularly liquid extracts. The University of Florida laboratory recommended that the limit for pseudoindoxyl be the same as the limit for 7-OH. Dr. Rahul Gupta, the former Director of the White House Office of National Drug Control Policy, recommended a ratio standard requiring at least 100 parts mitragynine for every 1 part of combined 7-OH and pseudoindoxyl, precisely so that the rule would not sweep in traditional botanical kratom.

**E. New Hope Botanicals placed the issue before DEA.**

73. Before the temporary order issued, New Hope Botanicals and other interested parties delivered to DEA written submissions and expert materials

concerning Docket DEA-1644. True and correct copies of representative examples of these written submissions and expert materials are attached as Exhibits G-I.

74. These written submissions explained that pseudoindoxyl may be present in trace amounts in natural kratom leaf, described the validated analytical method and measured concentrations, and warned that an unqualified listing under § 1308.11(h) would control traditional botanical kratom products because that subsection reaches mixtures and preparations containing any quantity of a listed substance.

75. The materials before DEA also included a July 10, 2026, letter from Agnes D. Winokur, a National Institute on Drug Abuse-funded kratom researcher at the University of Florida, reporting routine trace detection of pseudoindoxyl in leaf-based products by validated tandem mass spectrometry (Exhibit G); a July 27, 2026, comment from Dr. Rahul Gupta, the former Director of the White House Office of National Drug Control Policy, proposing an administrable ratio threshold (Exhibit H); and a July 31, 2026, comment from Pinney Associates urging that the 7-OH threshold approach be extended to pseudoindoxyl (Exhibit I). Accredited laboratory data quantifying pseudoindoxyl in unprocessed leaf and powder accompanied that record.

76. Dr. Gupta proposed a ratio standard requiring at least 100 parts mitragynine for every 1 part of combined 7-OH and pseudoindoxyl, precisely so that the rule would not sweep in traditional botanical kratom, modeled in regulatory function on DEA's treatment of 7-OH and designed to distinguish traditional botanical kratom from intentionally manufactured or concentrated products. Ex. H. It did not ask DEA to leave high-concentration pseudoindoxyl unregulated.

77. The proposed alternative was feasible because DEA had already drafted product category, concentration, and per-article criteria for 7-OH, and because validated testing can quantify pseudoindoxyl at concentrations relevant to a comparable regulatory line.

78. The proposed alternative was concrete: a ratio standard requiring at least 100 parts mitragynine to 1 part combined 7-OH and pseudoindoxyl, with an optional

absolute backstop of 0.10 percent, equivalent to 1,000 parts per million or 1 milligram per gram. The measured pseudoindoxyl content of unprocessed leaf, 2.6 to 14.3 parts per million, falls roughly two orders of magnitude below that backstop, confirming that a workable line exists.

79. The submission further requested that DEA delay issuance long enough to evaluate the new evidence or, at minimum, exclude traditional botanical kratom products below a scientifically defensible threshold from the temporary listing.

80. DEA signed the Temporary Scheduling Order on August 24, 2026, filed it with the Office of the Federal Register at 4:15 p.m. that day as FR Doc. 2026-17429, and published it on August 26, 2026. Schedules of Controlled Substances: Temporary Placement of Mitragynine Pseudoindoxyl, MGM-15, and MGM-16 in Schedule I, 91 Fed. Reg. 54,948 (Aug. 26, 2026). The order is "effective August 26, 2026, until August 26, 2028." Ex. A, 91 Fed. Reg. at 54,948. It separately lists mitragynine pseudoindoxyl (Drug Code 9672) at 21 C.F.R. § 1308.11(h)(89), MGM-15 (a/k/a dihydro-7-hydroxymitragynine) (Drug Code 9673) at § 1308.11(h)(90), and MGM-16 (a/k/a 9-fluoro- or 10-fluoro-dihydro-7-hydroxymitragynine) (Drug Code 9674) at § 1308.11(h)(91). Ex. A, 91 Fed. Reg. at 54,956. Each listing includes its isomers, esters, ethers, salts, and salts of its isomers, esters, and ethers, and each covers "compounds of this structure, regardless of numerical designation of atomic positions." Ex. A, 91 Fed. Reg. at 54,956. No listing contains any concentration, per-article, botanical, manufacturing, or de minimis limitation.

81. The Temporary Scheduling Order keys its dates and handling provisions to August 26, 2026, the date of publication. Ex. A, 91 Fed. Reg. at 54,948, 54,954-55. Those legal consequences attach automatically on that date, without further agency action.

82. The order rests on the same three-factor imminent-hazard analysis dated May 2026 and the same July 6, 2026, notice of intent record, and on HHS's January 20, 2026, no-objection letter. Ex. A, 91 Fed. Reg. at 54,949, 54,954. It identifies no

new evidentiary basis directed at traditional botanical kratom.

83. The order repeats the premise that all three substances "are produced through synthetic modifications of purified mitragynine isolates or 7-hydroxymitragynine," Ex. A, 91 Fed. Reg. at 54,951, and its market and forensic evidence concerns manufactured products—powders, tablets, liquid shots, and flavored chewable tablets sold under named brands such as Kama, Hydroxie, Fruity Perks, and Happie Tabs—rather than natural leaf. Ex. A, 91 Fed. Reg. at 54,950, 54,952.

84. The order nonetheless concedes the analytical difficulties on which Plaintiff's vagueness allegations rest, including the lack of readily available analytical reference standards, the time laboratories need to develop and validate methods, pseudoindoxyl's status as an oxidative metabolite of 7-OH, and the need for "specific method [sic] and instrumentation for accurate identification." Ex. A, 91 Fed. Reg. at 54,952. It prescribes no analytical method, confirmation criteria, limit of detection, or reporting limit.

85. On the effective date, the order imposes registration, surrender, security, labeling, inventory, recordkeeping, reporting, order-form, import/export, and quota obligations; prohibits retail sale to the general public; allows existing Schedule I researchers only a 90-day application window; gives current registrants only 30 days to conform labeling, inventory, and records; and exposes unauthorized handling to administrative, civil, and criminal sanctions. Ex. A, 91 Fed. Reg. at 54,954-55.

86. The Temporary Scheduling Order does not mention or address the July 10, 2026 Winokur letter, the July 27, 2026 Dr. Gupta comment, the July 31, 2026 Pinney Associates comment, or the accredited-laboratory data. It does not discuss the natural occurrence or natural formation of trace pseudoindoxyl in traditional botanical kratom, acknowledge the proposed ratio or concentration threshold, or rationally

explain why the scientific and regulatory distinction DEA accepted for 7-OH was unavailable for pseudoindoxyl.

87. The Temporary Scheduling Order discloses no new ground and instead carries forward the July 6, 2026, Pseudoindoxyl/MGM Notice's premise that the listed substances were produced through synthetic modification of purified isolates. Ex. A, 91 Fed. Reg. at 54,951. The order is silent on natural occurrence. Plaintiff's alternative notice allegations under § 811(h)(1)(A) are therefore triggered only if Defendants defend applying the Temporary Scheduling Order to traditional botanical kratom on a ground the July 6 Notice never published; if they do, DEA did not provide the 30-day notice of that ground required by § 811(h)(1)(A).

**F. Immediate and irreparable injury to New Hope Botanicals.**

88. The order took effect on publication on August 26, 2026, two days after DEA signed it and made it available to the public. Ex. A, 91 Fed. Reg. at 54,948. On that date, the full Schedule I controls and sanctions attach automatically to any material, mixture, or preparation containing any quantity of a listed substance, leaving Plaintiff no interval in which to obtain registrations or reconfigure operations.

89. New Hope Botanicals and its partners possess, manufacture, distribute, test, and have binding commitments involving traditional botanical kratom products that contain trace pseudoindoxyl under modern testing.

90. Absent relief, New Hope Botanicals must immediately cease covered operations, quarantine or destroy inventory, cancel contracts, refuse shipments, halt testing or research, or undertake costly reformulation and segregation. New Hope Botanicals cannot obtain Schedule I registrations, security modifications, state approvals, import/export authority, and customer or carrier acceptance in time to avoid those injuries.

91. The order also chills New Hope Botanicals from using sufficiently sensitive testing on its own products. A laboratory that accurately identifies trace pseudoindoxyl may convert a lawful botanical product into evidence that the product

is Schedule I, while less sensitive or less reliable testing may report "not detected." The law thus penalizes scientific accuracy and creates incentives to avoid the very methods needed for responsible quality control.

92. Plaintiff faces loss of customer relationships, goodwill, employees, market position, and irreplaceable research or product-development opportunities. These injuries cannot be fully measured or repaired after the temporary order expires.

93. Money damages are unavailable against Defendants for the challenged agency action. Plaintiff's economic losses are therefore unrecoverable and irreparable.

94. The Temporary Scheduling Order imposes "the regulatory controls and administrative, civil, and criminal sanctions applicable to schedule I controlled substances on persons who handle . . . or propose to handle these three 7-hydroxymitragynine-related substances." Ex. A, 91 Fed. Reg. at 54,948. New Hope Botanicals' ongoing regulated conduct and its possession of O.P.M.S. and other traditional botanical kratom products create a credible and non-speculative threat of enforcement.

95. The injuries are traceable to the zero-threshold pseudoindoxyl listing and would be redressed by vacatur, a stay, or an injunction preserving traditional botanical kratom products below a scientifically defensible threshold while DEA conducts a lawful analysis.

## CLAIMS FOR RELIEF

## CLAIM I

### Declaratory Judgment—Interpretation of the Temporary Scheduling Order

### 28 U.S.C. §§ 2201–2202; Fed. R. Civ. P. 57

96. Plaintiff realleges the preceding paragraphs.

97. The Declaratory Judgment Act authorizes this Court, in an actual controversy within its jurisdiction, to declare the rights and other legal relations of interested parties, whether or not further relief is or could be sought. Fed. R. Civ. P. 57 governs the procedure for obtaining that relief and confirms that another adequate

remedy does not preclude an otherwise appropriate declaratory judgment. Plaintiff seeks such a declaration to resolve the present controversy over whether the Temporary Scheduling Order reaches traditional botanical kratom products containing only naturally occurring or naturally formed trace pseudoindoxyl.

98. A real and immediate controversy exists. New Hope Botanicals possesses, manufactures, distributes, tests, researches, and has binding commitments involving traditional botanical kratom products that may contain trace pseudoindoxyl detectable under modern analytical methods. Defendants administer and enforce the CSA, and the published Temporary Scheduling Order provides that the Schedule I controls and the criminal, civil, and administrative provisions of the CSA attach on its August 26, 2026, effective date. Ex. A, 91 Fed. Reg. at 54,948, 54,954-55. New Hope Botanicals therefore needs a judicial declaration of the Temporary Scheduling Order's scope before it must choose between halting lawful operations involving traditional botanical kratom and risking enforcement based on trace detection. The controversy is immediate and concrete, not contingent on any future agency action.

99. The Temporary Scheduling Order should be interpreted in light of the companion 7-OH threshold action and the agencies' contemporaneous explanations. DEA issued the 7-OH Notice as an action to schedule 7-OH "above a specified threshold," while the Pseudoindoxyl/MGM notice addressed named 7-OH-related substances. HHS and FDA explained that the federal actions were "not intended to regulate natural leaf kratom that does not contain enhanced levels of 7-OH," (*see* Ex. E) and DEA stated that its threshold-based 7-OH action "does not apply to botanical kratom products that contain naturally occurring 7-OH below the specified threshold." *See* Ex. C. That context confirms that the agencies meant to target enhanced, synthetic, or concentrated products, not traditional botanical kratom.

100. That reading also harmonizes the published Temporary Scheduling Order, whose Schedule I controls attach on August 26, 2026, with DEA's public-safety rationale. DEA's release identified a proliferation of commercial products

containing semi-synthetic 7-OH and described products sold online and in gas stations, convenience stores, and smoke shops in forms such as powders, tablets, capsules, gummies, and dissolvable strips. The order carries that market description forward, Ex. A, 91 Fed. Reg. at 54,950, and HHS and FDA likewise described MP and MGM-15 as being sold online in candies, tablets, and liquid shots, often marketed as kratom extracts despite containing synthetic opioid compounds. Nothing in those statements identifies traditional botanical kratom as the source of the imminent public-safety problem.

101. Plaintiff does not dispute that DEA may regulate the products it identified: intentionally synthesized, isolated, enriched, fortified, or concentrated pseudoindoxyl; MGM-15; MGM-16; and products engineered or marketed to deliver enhanced opioid effects. The declaratory relief requested here would not disturb DEA's ability to enforce the Temporary Scheduling Order against those products. It would declare only that traditional botanical kratom products do not become Schedule I controlled substances merely because improved analytical testing detects trace pseudoindoxyl that was not intentionally synthesized, isolated, enriched, fortified, concentrated, or added.

102. The poppy-seed analogy confirms that interpretation. Federal controlled-substances law treats opium poppy and poppy straw as controlled material while defining both in a way that excludes seeds, even though poppy-seed issues can arise in the context of opiate testing. The relevant point is not that poppy seeds and kratom have the same chemistry. The point is that controlled-substances law can target hazardous plant-derived substances and preparations without turning ordinary plant matter into contraband solely because trace amounts of related controlled chemistry may be detected.

103. Interpreting the Temporary Scheduling Order to exclude traditional botanical kratom also avoids unnecessary conflict with § 811(h)(6). Plaintiff is not asking the Court, in Claim I, to set aside an order issued under § 811(h)(1). It asks the

Court to construe the Temporary Scheduling Order and declare the legal relations of the parties. That relief resolves uncertainty while preserving the order's operation against the enhanced, concentrated, and synthetic products that DEA and HHS identified as the public-safety concern.

104. The requested declaration is also the least disruptive remedy. It leaves the Temporary Scheduling Order viable against synthetic and enhanced products, protects public safety by focusing federal enforcement on the products DEA and HHS described, and gives responsible traditional botanical kratom businesses a clear compliance line. It also avoids penalizing scientific accuracy by ensuring that modern testing for trace botanical chemistry does not itself convert traditional botanical kratom into Schedule I evidence.

105. The Court should therefore declare that the Temporary Scheduling Order does not apply to traditional botanical kratom products whose only pseudoindoxyl or MGM-related content is naturally occurring, naturally formed, or present only in trace quantities without intentional synthesis, isolation, enrichment, fortification, concentration, or addition. Such a declaration would terminate the central controversy and permit both sides to proceed under a coherent understanding of the temporary order.

106. If the Court grants that declaration, it need not decide Plaintiff's alternative validity challenges. Those challenges arise only if the Temporary Scheduling Order is interpreted to reach traditional botanical kratom despite the agencies' statements that they were targeting enhanced, synthetic, or concentrated products.

/ / /

**CLAIM II**

**In the alternative, the Temporary Scheduling Order exceeds DEA's statutory authority as applied to traditional botanical kratom**

**5 U.S.C. § 706(2)(C); 21 U.S.C. § 811(h)**

**Pleaded *only* if the Temporary Scheduling Order is interpreted to reach traditional botanical kratom**

107. Plaintiff realleges the preceding paragraphs.

108. This claim is pleaded ***only*** in the alternative. It arises only if the Court concludes that the Temporary Scheduling Order applies to traditional botanical kratom products containing only naturally occurring or naturally formed trace pseudoindoxyl. If the Temporary Scheduling Order is interpreted not to reach those products, the Court need not decide this claim.

109. If the Temporary Scheduling Order is interpreted to reach traditional botanical kratom, DEA exceeded the authority conferred by § 811(h). Section 811(h)(1) authorizes temporary scheduling only if the Attorney General finds that temporary Schedule I control is necessary to avoid an imminent hazard to the public safety. In making that finding, DEA must consider the substance's history and current pattern of abuse, the scope, duration, and significance of abuse, and the risk to public health, including actual abuse, diversion from legitimate channels, and clandestine importation, manufacture, or distribution.

110. DEA made no such finding for traditional botanical kratom. DEA's public statements and the Federal Register materials identify enhanced, synthetic, concentrated, and commercially marketed opioid products as the public-safety concern. They do not identify traditional botanical kratom containing only trace, naturally formed pseudoindoxyl as a source of actual abuse, diversion, clandestine manufacture, or public-health risk. Applying the Temporary Scheduling Order to that category would therefore extend the order beyond the emergency findings Congress required.

111. The action DEA took was not limited to intentionally synthesized, isolated, enriched, fortified, or concentrated pseudoindoxyl. DEA listed mitragynine pseudoindoxyl without any concentration, per-article, botanical, manufacturing, or de minimis threshold. By operation of 21 C.F.R. § 1308.11(h), whose introductory language reaches "any material, compound, mixture or preparation which contains any quantity" of a listed substance, a zero-threshold listing would extend to traditional botanical kratom in which validated testing detects only trace pseudoindoxyl arising from the plant's own chemistry or ordinary post-harvest handling.

112. DEA's companion 7-OH action confirms that a limiting principle was readily available. There, DEA recognized that the same molecule may occur naturally in botanical material or be produced synthetically, that naturally occurring and synthetic forms are chemically identical, and that isolated or semi-synthetically derived formulations present a distinct public-safety profile only when concentrated above a threshold. Ex. D, 91 Fed. Reg. at 40,918. DEA therefore scheduled 7-OH only above specified concentration and per-article thresholds. *Id.* at 40,917–18. DEA made no finding, and offered no explanation, as to why a comparable limiting principle would be inadequate to address the pseudoindoxyl products identified in its record.

113. Section 811(h)(6) does not insulate that defect from review. It withdraws review only from "[a]n order issued under paragraph (1)." Whether DEA satisfied the substantive condition that makes agency action an order issued under paragraph (1) is an antecedent question that the provision does not commit to the agency's conclusive determination. Plaintiff does not ask the Court to reweigh a discretionary judgment made within lawfully invoked emergency authority. It alleges that DEA never acquired authority under § 811(h)(1) to control naturally occurring or naturally formed trace pseudoindoxyl in traditional botanical kratom.

114. If, and only if, the Temporary Scheduling Order is interpreted to apply to traditional botanical kratom, that application exceeds the authority and limitations imposed by 21 U.S.C. § 811(h) and must be held unlawful and set aside to that extent

under 5 U.S.C. § 706(2)(C), without disturbing the Temporary Scheduling Order's application to intentionally synthesized, isolated, enriched, fortified, concentrated, or added pseudoindoxyl, MGM-15, or MGM-16.

**CLAIM III**

**In the further alternative, the Temporary Scheduling Order is arbitrary and capricious as applied to traditional botanical kratom**

**5 U.S.C. § 706(2)(A)**

**Pleaded *only* if the Temporary Scheduling Order is interpreted to reach traditional botanical kratom**

115. Plaintiff realleges the preceding paragraphs.

116. This claim is pleaded in the further alternative and ***only*** if the Court interprets the Temporary Scheduling Order to apply to traditional botanical kratom products containing only naturally occurring or naturally formed trace pseudoindoxyl. If the Temporary Scheduling Order is interpreted not to reach those products, the Court need not decide this claim.

117. DEA relied on, or at least failed to correct, the premise that pseudoindoxyl in a product necessarily reflects synthetic modification rather than natural formation or trace botanical chemistry. The scientific allegations preserved in this Complaint show that modern methods can detect trace pseudoindoxyl in traditional botanical kratom, that pseudoindoxyl can arise through the mitragynine-to-7-OH pathway, and that trace botanical exposure differs by orders of magnitude from deliberately dosed or concentrated products. DEA did not rationally connect its evidence about high-potency products to a prohibition on traditional botanical kratom. The Temporary Scheduling Order confirms this defect: it neither addresses the natural-occurrence evidence submitted before issuance nor explains the asymmetry with the 7-OH threshold.

118. A broad interpretation would further treat materially comparable circumstances inconsistently. In the companion 7-OH action, DEA recognized that

the same molecule may occur naturally in botanical material or appear in concentrated or synthetic products, and it used thresholds to separate those categories. DEA did not explain why the same regulatory logic could not apply to pseudoindoxyl once evidence showed that trace pseudoindoxyl may be detected in traditional botanical kratom. That unexplained asymmetry is especially hard to justify because HHS and FDA publicly emphasized that the federal actions were not intended to capture traditional botanical kratom.

119. DEA had feasible alternatives that would have preserved public safety without sweeping in traditional botanical kratom. DEA could have adopted a concentration, ratio, per-article, botanical, manufacturing, or de minimis limitation modeled on the 7-OH threshold. The Temporary Scheduling Order, now published, confirms that DEA proceeded without adopting any of those limiting alternatives. Ex. A, 91 Fed. Reg. at 54,956. DEA could also have delayed enforcement against traditional botanical products long enough to consider validated testing and threshold evidence. If the Temporary Scheduling Order is instead read to impose a zero-threshold rule on traditional botanical kratom, it fails to consider important aspects of the problem and less disruptive means of addressing the identified hazard.

120. The press releases make the defect clearer. DEA and HHS told the public that the federal action targeted highly concentrated, synthetic, enhanced, and derivative products and was not intended to regulate traditional botanical kratom lacking enhanced 7-OH. An interpretation that nevertheless treats traditional botanical kratom as Schedule I because of trace pseudoindoxyl would make the operative legal rule broader than the agencies' stated rationale. That mismatch is arbitrary, capricious, and not in accordance with law.

121. Plaintiff's alternative validity challenge is limited. Plaintiff does not seek to invalidate the Temporary Scheduling Order as applied to intentionally synthesized, isolated, enriched, fortified, concentrated, or added pseudoindoxyl, MGM-15, or MGM-16, or to products marketed or engineered to deliver enhanced opioid effects.

Plaintiff challenges only the application of the Temporary Scheduling Order to traditional botanical kratom products whose only relevant content is naturally occurring, naturally formed, or trace botanical chemistry.

122. If, and only if, the Temporary Scheduling Order is interpreted to apply to traditional botanical kratom, that application rests on a material factual error, fails to consider important aspects of the problem, treats materially comparable circumstances inconsistently without explanation, and lacks a rational connection between the facts found and the action taken. It is therefore arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and must be held unlawful, set aside, stayed, or enjoined to that extent under 5 U.S.C. §§ 705 and 706(2)(A).

**CLAIM IV**

**In the further alternative—Nonstatutory ultra vires review**

**Pleaded *only* if statutory review is unavailable**

123. Plaintiff realleges the preceding paragraphs.

124. This claim is pleaded ***only*** if the Court interprets the Temporary Scheduling Order to apply to traditional botanical kratom and also concludes that the APA does not supply a cause of action for Plaintiff's alternative validity challenges or otherwise concludes that only nonstatutory equitable review is available to address an ultra vires application of the Temporary Scheduling Order to traditional botanical kratom.

125. Plaintiff recognizes that nonstatutory ultra vires review is exceptionally narrow. It is available only where an agency acts entirely beyond its delegated powers and contrary to a specific statutory limitation, not whenever an agency arguably misconstrues or misapplies a statute within its assigned field.

126. Section 811(h)(1) imposes such a specific limitation. It permits DEA to exercise extraordinary emergency scheduling authority only when temporary scheduling is "necessary to avoid an imminent hazard to the public safety." Section

811(h)(3) further requires consideration of identified abuse and public-health factors in making that finding. Those limitations are central to Congress's delegation of authority to define conduct carrying severe criminal, civil, administrative, and forfeiture consequences.

127. If the Temporary Scheduling Order is interpreted to apply to traditional botanical kratom, DEA acted beyond that delegated power by imposing Schedule I control on trace naturally occurring or naturally formed pseudoindoxyl/MGM chemistry in traditional botanical kratom products without finding that control of those quantities was necessary to avoid an imminent hazard and without analyzing those products under the statutory factors.

128. This claim does not ask the Court to disagree with DEA's weighing of competing evidence within an established sphere of authority. It alleges that the findings DEA made concern a materially narrower category—intentionally manufactured and concentrated pseudoindoxyl products—and therefore do not activate the statutory authority to control naturally occurring trace quantities in traditional botanical kratom.

129. Should the Court interpret the Temporary Scheduling Order to apply to traditional botanical kratom and also conclude that the APA does not supply a cause of action for Plaintiff's alternative validity challenges or otherwise conclude that only nonstatutory equitable review is available to address an ultra vires application of the Temporary Scheduling Order to traditional botanical kratom, Plaintiff has no other adequate avenue to obtain timely relief from the immediate consequences of the zero-threshold listing. Section 811(h)(6) purports to foreclose direct review; requiring Plaintiff to violate the Order and risk criminal prosecution is not an adequate prospective remedy; and later review of a permanent scheduling decision cannot restore destroyed inventory, lost contracts, terminated research, displaced employees, or business goodwill lost during the temporary-order period.

130. Section 811(h)(6) protects "[a]n order issued under paragraph (1)." It does not independently authorize action outside the limits of paragraph (1), nor does it place beyond judicial inquiry an attempted exercise of power that Congress specifically withheld. If the Temporary Scheduling Order is interpreted to reach traditional botanical kratom, the Court should declare that application ultra vires and enjoin it.

**CLAIM V**

**Fifth Amendment—As-applied vagueness, lack of fair notice, and arbitrary enforcement**

**Pleaded in the further alternative**

131. Plaintiff realleges the preceding paragraphs.

132. This claim is independently constitutional and is pleaded only if the Temporary Scheduling Order is interpreted to apply to traditional botanical kratom. Plaintiff challenges the constitutionality of applying an unrestricted pseudoindoxyl/MGM listing to traditional botanical kratom whose only pseudoindoxyl or MGM-related content is naturally occurring or naturally formed at trace concentrations.

133. DEA established no concentration threshold, officially prescribed analytical method, required confirmatory criteria, limit of detection, limit of quantitation, sampling protocol, measurement-uncertainty rule, or other objective decision standard by which a regulated person can determine whether traditional botanical kratom is deemed to contain pseudoindoxyl.

134. At the trace concentrations found in traditional botanical kratom, the result is dependent on the testing method. Testing of aliquots from the same product lot by qualified laboratories has produced materially different results, including positive findings, estimated findings below a validated limit of quantitation, and reports of "not detected." Whether a product is classified as containing a Schedule I substance may therefore depend on the sensitivity and selectivity of the laboratory and

method selected, rather than on any uniform standard announced by DEA.

135. The dependence on method is documented, not theoretical. Pseudoindoxyl and 7-OH are isomers sharing the same nominal mass, and kratom contains more than fifty alkaloids, many of which absorb light at the same wavelengths; a laboratory using ultraviolet detection, which distinguishes compounds only by retention time and absorbance, cannot reliably tell them apart and lacks the sensitivity to measure the single-digit parts-per-million levels found in leaf at all. Only tandem mass spectrometry with chromatographic separation and confirmatory qualifier-ion ratios resolves the two. Whether Plaintiff's material is deemed to contain a Schedule I substance thus turns on which laboratory technique is used.

136. The Temporary Scheduling Order acknowledges that laboratories have lacked readily available analytical reference standards; that development and validation of the necessary testing methods take time; and that pseudoindoxyl and closely related compounds "require specific method and instrumentation for accurate identification." Ex. A, 91 Fed. Reg. at 54,952. DEA nevertheless supplied no standard identifying which methods, confirmation criteria, or reporting limits establish the legally consequential presence of pseudoindoxyl.

137. The defect is not merely that proof of a prohibited fact may sometimes be difficult. At trace levels, DEA has failed to specify the analytical decision rule that determines what fact counts as the legally sufficient presence of pseudoindoxyl. Materially identical products may consequently receive opposite legal classifications depending upon the laboratory and methodology employed.

138. That is why Dr. Rahul Gupta, the former Director of the White House Office of National Drug Control Policy, recommended that any rule turn on a quantifiable concentration above a validated limit of quantitation rather than on any detectable amount: detection alone depends on laboratory sensitivity and would produce inconsistent enforcement outcomes. DEA adopted the standard that comment warned against and supplied no validated method, reporting limit, or confirmation

criteria of its own.

139. DEA's Notice compounds the lack of notice by describing pseudoindoxyl as a synthetic derivative produced through modification of purified mitragynine or 7-hydroxymitragynine, a description the Temporary Scheduling Order repeats, Ex. A, 91 Fed. Reg. at 54,951, while the unrestricted listing facially reaches traditional botanical kratom containing naturally arising trace pseudoindoxyl. A regulated business reading the Notice and the listing together cannot determine whether DEA intends to control only the manufactured products discussed in its analysis or every botanical product in which sufficiently sensitive testing detects a trace quantity.

140. Any scienter requirement applicable to a particular criminal prosecution may limit criminal liability in some circumstances, but it does not provide Plaintiff an objective standard by which to determine prospectively whether its inventory and ordinary business activities involve a Schedule I substance, or prevent inconsistent administrative and enforcement classifications based on laboratory-dependent results.

141. As applied to Plaintiff's traditional botanical kratom products containing no intentionally synthesized, isolated, enriched, fortified, concentrated, or added pseudoindoxyl, the unrestricted listing fails to provide constitutionally adequate notice and permits arbitrary and inconsistent enforcement, in violation of the Due Process Clause of the Fifth Amendment.

142. Section 811(h)(6) contains no clear statement foreclosing review of this independently constitutional claim.

WHEREFORE, Plaintiff respectfully requests that the Court:

(a) declare that the Temporary Scheduling Order does not apply to traditional botanical kratom products whose only pseudoindoxyl or MGM-related content is naturally occurring, naturally formed, or present only in trace quantities without intentional synthesis, isolation, enrichment, fortification, concentration, or addition;

(b) in the alternative, if the Temporary Scheduling Order is interpreted to apply to traditional botanical kratom, hold that application unlawful, set it aside, vacate it, and remand under 5 U.S.C. § 706(2)(C), or alternatively under § 706(2)(A) or (D), without disturbing the Temporary Scheduling Order's application to intentionally synthesized, isolated, enriched, fortified, concentrated, or added pseudoindoxyl, MGM-15, or MGM-16;

(c) stay, under 5 U.S.C. § 705, the August 26, 2026, effective date and enforcement of the Temporary Scheduling Order pending final judgment to the extent Defendants contend that it applies to traditional botanical kratom products containing only naturally occurring or naturally formed trace pseudoindoxyl or MGM-related content;

(d) grant expedited consideration and interim relief promptly after the August 26, 2026 effective date because the Temporary Scheduling Order attached Schedule I controls automatically upon publication on that date;

(e) preliminarily and permanently enjoin Defendants from enforcing the Temporary Scheduling Order against New Hope Botanicals' traditional botanical kratom products, including its O.P.M.S. brand products, that contain no intentionally synthesized, isolated, enriched, fortified, concentrated, or added pseudoindoxyl, MGM-15, or MGM-16 and contain at least 100 parts mitragynine for every 1 part of combined 7-OH and pseudoindoxyl;

(f) alternatively, enjoin such enforcement until DEA clarifies the Temporary Scheduling Order or considers the scientific evidence and determines, through a reasoned and scientifically defensible analysis, an ascertainable line distinguishing traditional botanical kratom from intentionally manufactured, enhanced, or concentrated pseudoindoxyl/MGM products;

(g) declare that 21 U.S.C. § 811(h)(6) does not preclude declaratory interpretation of the Temporary Scheduling Order's scope and, in any event, does not preclude review of Plaintiff's alternative ultra vires and independently colorable Fifth

Amendment claims if the Temporary Scheduling Order is interpreted to apply to traditional botanical kratom;

(h) if the Court concludes that exclusive jurisdiction over any claim lies in a court of appeals, transfer that claim or the action under 28 U.S.C. § 1631 rather than dismiss it;

(i) award Plaintiff its reasonable costs and attorneys' fees under 28 U.S.C. § 2412 to the extent authorized; and

(j) grant such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a trial by jury on all claims and issues so triable in this action.

/ / /

Dated: August 31, 2026

Respectfully submitted,

KILPATRICK TOWNSEND & STOCKTON LLP

By: */s/ Eric B. Evans*

KILPATRICK TOWNSEND & STOCKTON LLP
Eric B. Evans
1302 El Camino Real, Suite 175
Menlo Park, CA 94025
Telephone: (650) 326-2400
Facsimile: (650) 326-2422
eevans@ktslaw.com

Gwendolyn C. Payton (*pro hac vice* to be filed)
John Neeleman (*pro hac vice* to be filed)
1420 5th Avenue, Suite 3700
Seattle, WA 98101
Telephone: (206) 467-9600
Facsimile: (206) 623-6793
gpayton@ktslaw.com
jneeleman@ktslaw.com

*Attorneys for Plaintiff*
NEW HOPE BOTANICALS, LLC

157005369v.2