# EXHIBIT A

the Registry for each area code of data from $82 lo $85 pet· area code, and (2) tlle maximum amount that will be charged lo any s'ingle enUty for accessing area codes of data from $22,626 to $23,425. Entities may add area codes during the socond six months of their annual subscription period, and tlle fee for those additional area codes increases from $41 lo $43.

These incrnases am in accordance with the Act, which specifies that beginning after fiscal year 2009, the dollar amounts charged shall be increased by an amount equal lo the amounts specified in the Act, multiplied by the percentage (if any) by which the average of the monthly consunrnr price index (for all u.rban c011sumets pub1ished by the Department ofLabor) ("CPI") for tlte most recently ended 12-month period ending on June 30 exceeds lhe CPI for the 12-month period ending Jw1e 30, 2008. The Act also slates that anv increase shall be rounded to the nearest dollar and that there shall be no inci-ease in the dollai- amounts if Ihe change in the CPI since the lasl foe incrnase is less than one percent. For fiscal year 2009, the Act specified thaL Ihe origi11al annual fee for access to the Registry for each area code of data was $54 per area code, or $27 pet area code of data du.ring the second six months of an entily's annual subscription period, and that the maximum amount that would be charged to any single entity for accessing area codes of data would be $14,850.

The delerminalion of whether a fee change is required and the amow1l of the fee changes involves a two-step process. First, to determine whether a feo change is required, wo me.asw·e the change in the CPI from the time of the previous increase in foes. There was an increase in Ihe foes for fiscal vear 2026. Accordingly, we calculated tfm change in lhe CPI since last year, and the increase was 3.5 percent. Because this change is over the one percent thueshold, the fees will change for fiscal year 2027.

Second, to determine how mnch the fees should inci-ease this fiscal year, wa use the calculation specified by lhe .Act set forth above: the percentage change in Ille baseline CPI applied Io llm original fees for fiscal year 2009. The average value of the CPl for July 1, 2007, to Jlll1e 30, 2008, was 211.702; lhe average value for fuly 1, 2025, to June 30, 2026, was 333.952, an increase of 57.75 percent Applying Ihe 57.75 percent increase to Ille base amount from fiscal year 2009, leads Io a $85 fee for access to a single area code. of data for a full year for fiscal year 2027, an increase of $3 from last year. The actual amount is $85.18 but when rounded, pursuant lo the Acl, $85 is the apprnpriate fee. The fee for accessing an additional area code for a half year increases by lwo dollars lo $43 (rounded from $42.59). The maximum amount charged increases to $23,425 (roundocl from $23,425.32).

## Administrative Procedure Act; Regulatory Flexibility Act; Paperwork Reduction Act

Under the Adminislrative Pmcedure Act (5 U.S.C. 553(b)). an agency may waive Ille normal nolice and comment rriquiremenls if it finds, for good cause, that they are impracticable, unnecessary, or conlrary to the public interest. The fee adjustments set forth in this final rule are mandated by the Do-Nol-Call Registry Fee Extension Act of 2007. Accordingly, tho anrnndmenls to the TSR are merely lechnical in nature, making notice and comment unnecessary and contrary to the public interest. *See* 5 U.S.C. 553(b). For this reason, the rnquiremenls of the RBgulalory Flexibilily Act. ::uso do not apply. *See* 5 U.S.C. 603, 604.

Pursuant to the Paperwork Reduction Act, 44 U.S.C. 3501-3521, Ihe Office of Management and Budget ("OMB") approved the information collection requii-ements in the TSR and assigned the followiJ1g existing 0MB Control Nmnber: 3084-0169. The amendments outlined in this final rule pertain only to Ille fee provision(§ 310.8) of the TSR and will not establish or alter any record keepiJ1g, reporting, or third-party disclosure requirements elsewhere in the TSR.

## List of Subjects in 16 CFR Part 310

Advertising. Consumer p.rotection, Reporting and recordkeeping requirements, Telephone, Trade praclic()s.

Accordingly, tlm Federal Trade Commission amends part 310 of title 16 of the Code of Federal RegulaUons as follows:

## PART 310-TELEMARKETING SALES RULE

■ 1. The authority citation for part 310 continues to read as follows:

Authority: 15 U.S.C. 6101-6108.

**§310.8 (Amended]**

■ 2. Amend§ 310.8 by:

■ a. In paragraph (c):

■ i. Removing "$82" and adding "$85" in its place; and

■ ii. Removing "$22,626" and adding "$23,425" in its place;

■ b. In paragraph (d):

■ i. Removing "$82" and adding ''$85" in its place; and

■ ii. Removing "$41" and adding "$43" in its place.

By direction of the Commission.

Joel Christie,

*Acti1lg* ***Secretary.***

[FR Doc. 2026-17428 Filed 8-25-26: 8:45 am]

BILLING CODE 6750-01-P

## DEPARTMENT OF JUSTICE

## Drug Enforcement Administration

## 21 CFR Part 1308

**[Docket No. DEA-1644]**

## Schedules of Controlled Substances: Temporary Placement of Mitragynine Pseudoindoxyl, MGM-15, and MGM-16 In Schedule I

**AGENCY:** Drug Enforcement Administration, Department of Justice.

**ACTION:** Temporary amendment; temporary scheduling order.

**SUMMARY:** The Drug Enforceme11t Administration (DEA) is issuing this temporary order Io schedule three 7-hydroxymilragynine-related subslances (milragynine pseudoindoxyl, MGM-15, and MGM-16), including thefr isomm's, esters, etlters, salts, and salts of isomers, esters. and ethers, whenover Ihe existence of such isomers, esters, ethers, and salls is possible, in schedule I of the Controlled Substances Act. DEA bases this acUon on a fi11dfog tbat placing mitragynine pseudoindoxyl, MGM-15, and MGM-16 in schedule I is necessary to avoid an immitrnnt hazard to pub1ic safely. This order imposes lhe regulalory controls and administrative, civil, and criminal sa.ncUons applicable to schedule I controlled substances on persons who handle (manufacture, distribute, .reverse distribute, import, export, engage in research, conducL instructional acliviUes or chemical analysis with, 01· possess) or propose to handle these three 7-hydroxymiltagynine-related subs lances.

**DATES:** This temporary order is effective August 26, 2026, until August 26, 2028. If this order is exte11ded or made permanent, DEA will publish a document iu tho Federal Register.

**ADDRESSES:** 8701 Morrissette Drive, Springfield, Virginia 22152.

**FOR FURTHER INFORMATION CONTACT:** Terrence L. Boos, Drug and Chemical Evaluation Section, Diversion Control DivL ion, Drug Enforcement Adrninistration: MaiHng Address: 8701 Mo1·i-issette Drive, Springfield, Virginia 22152; Telephone: (571) 362-3249.

**SUPPLEMENTARY INFORMATION:** The Drug Enforcement Administration (DEA)

issues a temporary scheduling order[1] (in the form of a temporary amendment) to add three 7-hydroxymitragynine-related substances, including their isomers, esters, ethers, salts, and salts of isomers, esters, and ethers, whenever the existence of such isomers, esters, ethers, and salts is possible, to schedule I under the Controlled Substances Act (CSA):

• Methyl (*E*)-2-((1′*S*,6′*S*,7′*S*)-6′-ethyl-4-methoxy-3-oxo-3′,5′,6′,7′,8′,8*a*′-hexahydro-2′*H*-spiro[indoline-2,1′-indolizine]-7′-yl)-3-methoxyacrylate (commonly known as mitragynine pseudoindoxyl). Since nomenclature of this substance is not internationally standardized, compounds of this structure, regardless of numerical designation of atomic positions are covered.

• Methyl (*E*)-2-((2*S*,3*S*,7*aS*,12*aR*,12*bS*)-3-ethyl-7*a*-hydroxy-8-methoxy-1,2,3,4,6,7,7*a*,12,12*a*,12*b*-decahydroindolo[2,3-*a*]quinolizin-2-yl)-3-methoxyacrylate (commonly known as MGM–15; also known as dihydro-7-hydroxymitragynine). Since nomenclature of this substance is not internationally standardized, compounds of this structure, regardless of numerical designation of atomic positions are covered.

• Methyl (*E*)-2-((2*S*,3*S*,7*aS*,12*aR*,12b*S*)-3-ethyl-9-fluoro-7*a*-hydroxy-8-methoxy-1,2,3,4,6,7,7*a*,12,12*a*,12*b*-decahydroindolo[2,3-*a*]quinolizin-2-yl)-3-methoxyacrylate (commonly known as MGM–16; also known as 9-fluoro-dihydro-7-hydroxymitragynine; or 10-fluoro-dihydro-7-hydroxymitragynine (depending on numbering convention). Since nomenclature of this substance is not internationally standardized, compounds of this structure, regardless of numerical designation of atomic positions are covered.

## Legal Authority

The CSA provides the Attorney General with the authority to temporarily place a substance in schedule I of the CSA for two years without regard to the requirements of 21 U.S.C. 811(b), if he finds that such action is necessary to avoid an imminent hazard to public safety.[2] In addition, if proceedings to control a substance are initiated under 21 U.S.C. 811(a)(1) while the substance is temporarily controlled under section 811(h), the Attorney General may extend the temporary scheduling for up to one year.[3]

Where the necessary findings are made, a substance may be temporarily scheduled if it is not listed in any other schedule under 21 U.S.C. 812, or if there is no exemption or approval in effect for the substance under section 505 of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. 355.[4] The Attorney General has delegated scheduling authority under 21 U.S.C. 811 to the Administrator of DEA (Administrator).[5]

## Background

The CSA requires the Administrator to notify the Secretary of the Department of Health and Human Services (HHS) of an intent to temporarily place a substance in schedule I of the CSA (*i.e.*, to issue a temporary scheduling order).[6] By letter dated December 15, 2025, the Administrator transmitted the required notice to place mitragynine pseudoindoxyl, MGM–15, and MGM–16 in schedule I on a temporary basis to the Assistant Secretary for Health of HHS (Assistant Secretary).[7] By letter dated January 20, 2026, the Assistant Secretary responded to this notice and advised that, based on a review by the Food and Drug Administration (FDA), there were currently no investigational new drug applications (IND) or approved new drug applications (NDA) for mitragynine pseudoindoxyl, MGM–15, and MGM–16. The Assistant Secretary also stated that HHS had no objection to the temporary placement of these substances in schedule I of the CSA.

DEA has taken into consideration the Assistant Secretary's comments as required by 21 U.S.C. 811(h)(4). DEA has found the control of mitragynine pseudoindoxyl, MGM–15, and MGM–16 in schedule I on a temporary basis is necessary to avoid an imminent hazard to public safety.

As required by 21 U.S.C. 811(h)(1)(A), DEA published a notice of intent (NOI) to temporarily schedule mitragynine pseudoindoxyl, MGM–15, and MGM–16 in the **Federal Register** on July 6, 2026.[8] That NOI discussed findings from DEA's three-factor analysis dated May 2026, which DEA made available on *www.regulations.gov*.

To find that temporarily placing a substance in schedule I of the CSA is necessary to avoid an imminent hazard to public safety, the Administrator must consider three of the eight factors set forth in 21 U.S.C. 811(c): the substance's history and current pattern of abuse; the scope, duration and significance of abuse; and what, if any, risk there is to public health.[9] Consideration of these factors includes any information indicating actual abuse, diversion from legitimate channels, and clandestine importation, manufacture, or distribution of mitragynine pseudoindoxyl, MGM–15, and MGM–16.[10]

Substances meeting the statutory requirements for temporary scheduling may only be placed in schedule I.[11] Substances in schedule I have high potential for abuse, no currently accepted medical use in treatment in the United States,[12] and a lack of accepted

[1] Though DEA has used the term "final order" with respect to temporary scheduling orders in the past, this notice of intent adheres to the statutory language of 21 U.S.C. 811(h), which refers to a "temporary scheduling order." No substantive change is intended.

[2] 21 U.S.C. 811(h)(1).

[3] 21 U.S.C. 811(h)(2).

[4] 21 U.S.C. 811(h)(1); 21 CFR part 1308.

[5] 28 CFR 0.100.

[6] 21 U.S.C. 811(h)(4).

[7] The Secretary of HHS has delegated to the Assistant Secretary for Health of HHS the authority to make domestic drug scheduling recommendations. *Comprehensive Drug Abuse Prevention and Control Act of 1970, Public Law 91–513, As Amended; Delegation of Authority*, 58 FR 35460 (July 1, 1993).

[8] *Schedules of Controlled Substances: Temporary Placement of mitragynine pseudoindoxyl, MGM–15, and MGM–16 in Schedule I*, 91 *FR* 40909 (July 6, 2026).

[9] 21 U.S.C. 811(c)(4)–(6), (h)(3).

[10] 21 U.S.C. 811(h)(3).

[11] 21 U.S.C. 811(h)(1).

[12] When finding schedule I placement on a temporary basis is necessary to avoid imminent hazard to the public, 21 U.S.C 811(h) does not require DEA to consider whether the substance has a currently accepted medical use in treatment in the United States. Nonetheless, there is no evidence suggesting that mitragynine pseudoindoxyl, MGM–15, and MGM–16 have a currently accepted medical use in treatment in the United States. First, DEA looks to whether the drug or substance has FDA approval for marketing in interstate commerce. When no FDA approval exists, DEA has traditionally applied a five-part test to determine whether a drug or substances has a currently accepted medical use: (1) the drug's chemistry must be known and reproducible; (2) there must be adequate safety studies; (3) there must be adequate and well-controlled studies proving efficacy; (4) the drug must be accepted by qualified experts; and (5) the scientific evidence must be widely available. *Marijuana Scheduling Petition; Denial of Petition; Remand*, 57 FR 10499 (Mar. 26, 1992), pet. for rev. denied, *Alliance for Cannabis Therapeutics* v. *Drug Enforcement Admin.*, 15 F.3d 1131, 1135 (D.C. Cir. 1994). DEA applied the traditional five-part test and concluded the test was not satisfied. Since 2023, HHS has generally applied its own two-part test to determine currently accepted medical use for substances that do not satisfy the five-part test: (1) whether there exists widespread, current experience with medical use of the substance by licensed health care providers operating in accordance with implemented jurisdiction-authorized programs, where medical use is recognized by entities that regulate the practice of medicine, and, if so, (2) whether there exists some credible scientific support for at least one of the medical conditions for which part (1) is satisfied. On April 11, 2024, the Department of Justice's Office of Legal Counsel (OLC) issued an opinion, which, among other things, concluded that HHS's two-part test would be sufficient to establish that a drug has a currently accepted medical use. Office

Continued

safety for use under medical supervision.[13]

**Three 7-Hydroxymitragynine-Related Substances: Mitragynine Pseudoindoxyl, MGM–15, and MGM–16**

The prevalence and misuse of *Mitragyna speciosa* (commonly known as kratom) and its psychoactive alkaloids, including mitragynine and 7-hydroxymitragynine, have led to the proliferation of commercial products containing opioids chemically synthesized from mitragynine or 7-hydroxymitragynine. In recent years, mitragynine pseudoindoxyl, which is a chemical rearrangement product of 7-hydroxymitragynine, and MGM–15, which is a derivative of 7-hydroxymitragynine, have recently emerged on the *Mitragyna speciosa* consumer markets. MGM–16 is a highly potent opioid and shares a similar pharmacological profile with mitragynine pseudoindoxyl and MGM–15. The chemical scaffolds of mitragynine or 7-hydroxymitragynine were used in scientific research to develop mitragynine pseudoindoxyl, MGM–15, or MGM–16 via chemical modifications of purified isolates. Evidence from the *Mitragyna speciosa* retail markets demonstrates that mitragynine pseudoindoxyl and MGM–15 have transitioned from experimental substances studied in research to widely available commercial products. These products are commonly sold in different forms such as powders, tablets, and liquid shots. This is a significant evolution from the traditional administration of *Mitragyna speciosa*, which was once restricted to either chewing raw leaves or steeping the leaves into water decoctions and teas.

These products are sold under numerous brand names like Kama, Hydroxie, Fruity Perks, and Happie Tabs,[14] and they are easily purchased on the internet, as well as in gas stations, corner shops, and vape shops. These products are available in consumer-friendly forms, including flavored chewable tablets, which increases their appeal to a broader demographic. Also, the aggressive marketing of these semisynthetic opioids (mitragynine pseudoindoxyl, MGM–15) as "precision-formulated products," "botanical extracts," or as "mood boosters" for the treatment of health conditions is deeply concerning. The branding creates a false sense of safety for unknowing consumers who may equate the term "botanical" with lower risk. Furthermore, there is paucity of data on quality control or standardized dosage available for these products, making their use especially dangerous.

Mitragynine pseudoindoxyl, MGM–15, and MGM–16 are potent opioids that share a similar pharmacological profile with 7-hydroxymitragynine and morphine. Available pharmacology data demonstrate that mitragynine pseudoindoxyl, MGM–15, and MGM–16 exhibit strong affinity for the mu-opioid receptor (MOR) and function as MOR agonists.[15 16] Data from preclinical studies show that these substances produce analgesic effects that is more potent than morphine.[17] Because mitragynine pseudoindoxyl, MGM–15, and MGM–16 are potent MOR agonists, they pose similar health risks as other mu-opioid agonists (*i.e.*, morphine and fentanyl), including physical and psychological dependence, and respiratory depression.

A scan of retail data on the internet shows that vendors explicitly market mitragynine pseudoindoxyl and MGM–15 for their "clean and powerful" opioid-receptor activation, utilizing deceptive terminology to target individuals seeking alternatives to pharmaceutical opioids. These combinations and marketing strategies pose significant safety risks to unsuspecting consumers who use these products by exposing them to high doses of opioids. Recently, reports have confirmed the positive identification of mitragynine pseudoindoxyl and MGM–15 in toxicology cases in the United States, and evidence demonstrates that these substances are being misused. The lack of clinical data regarding their safety and efficacy, coupled with the risk of life-threatening respiratory depression and addiction, underscores the danger of marketing these unapproved, highly potent opioids under the guise of therapeutic or wellness products.

While no evidence supports the presence of MGM–16 on the *Mitragyna speciosa* consumer market, its profile as a highly potent opioid that is structurally related to 7-hydroxymitragynine lends itself as an attractive substitute that could emerge on the illicit drug market. MGM–16 is synthetically manufactured for research purposes and is not approved for any clinical indication in the United States. DEA's investigation of publicly available information, including popular online platforms, revealed that at least some individuals intend to abuse MGM–16. Recent online surveillance of a vendor site[18] listed MGM–16 for upcoming sale. The sale of products containing mitragynine pseudoindoxyl and MGM–15, and the potential sale of MGM–16, poses an imminent hazard to public safety.

Available data and information for mitragynine pseudoindoxyl, MGM–15, and MGM–16, summarized below, indicate that these substances have a high potential for abuse, no currently accepted medical use in treatment in the United States, and a lack of accepted safety for use under medical supervision. DEA's three-factor analysis is available in its entirety under "Supporting and Related Material" of the public docket for this action at *www.regulations.gov* under Docket Number DEA–1644.

**Factor 4. History and Current Pattern of Abuse**

Mitragynine pseudoindoxyl, MGM–15, and MGM–16 are synthetic derivatives of the indole alkaloids, mitragynine or 7-hydroxymitragynine, of the *Mitragyna speciosa* plant. Unlike the indole alkaloids mitragynine and 7-hydroxymitragynine, which are naturally occurring in the plant, mitragynine pseudoindoxyl, MGM–15,

of Legal Counsel, Memorandum for Merrick B. Garland Attorney General Re: Questions Related to the Potential Rescheduling of Marijuana at 3 (April 11, 2024). For purposes of this temporary order, there is no evidence that health care providers have widespread experience with medical use of mitragynine pseudoindoxyl, MGM–15, and MGM–16, or that the use of these substances is recognized by entities that regulate the practice of medicine, so the two-part test also is not satisfied. In its letter dated January 20, 2026, HHS advised DEA that there were currently no approved NDAs or INDs for mitragynine pseudoindoxyl, MGM–15, and MGM–16. Additionally, HHS noted it had no objections to the temporary placement of these substances in schedule I of the CSA.

[13] 21 U.S.C. 812(b)(1).

[14] The list of brand names is illustrative, non-exhaustive, and provided solely as market context.

[15] Matsumoto, K., Narita, M., Muramatsu, N., Nakayama, T., Misawa, K., Kitajima, M., Tashima, K., Devi, L.A., Suzuki, T., Takayama, H., & Horie, S. (2014). Orally active opioid μ/δ dual agonist MGM–16, a derivative of the indole alkaloid mitragynine, exhibits potent antiallodynic effect on neuropathic pain in mice. *The Journal of Pharmacology and Experimental Therapeutics*, 348(3):383–392.

[16] Yamamoto, L.T., Horie, S., Takayama, H., Aimi, N., Sakai, S., Yano, S., Shan, J., Pang, P.K., Ponglux, D., & Watanabe, K. (1999). Opioid receptor agonistic characteristics of mitragynine pseudoindoxyl in comparison with mitragynine derived from Thai medicinal plant Mitragyna speciosa. *General Pharmacology*, 33(1):73–81.

[17] Váradi, A., Marrone, G.F., Palmer, T.C., Narayan, A., Szabó, M.R., Le Rouzic, V., Grinnell, S.G., Subrath, J.J., Warner, E., Kalra, S., Hunkele, A., Pagirsky, J., Eans, S.O., Medina, J.M., Xu, J., Pan, Y.X., Borics, A., Pasternak, G.W., McLaughlin, J.P., & Majumdar, S. (2016). Mitragynine/Corynantheidine Pseudoindoxyls As Opioid Analgesics with Mu Agonism and Delta Antagonism, Which Do Not Recruit β-Arrestin-2. *Journal of Medicinal Chemistry*, 59(18):8381–8397.

[18] MGM Series Guide: Science of MGM–15 Alkaloids | Getwell Depot. *https://getwelldepot.com/mgm/*. Accessed April 9, 2026. (Web content subsequently modified or removed; hardcopy preserved in DEA administrative record)

and MGM–16 are produced through synthetic modifications of purified mitragynine isolates or 7-hydroxymitragynine.[19] The chemical scaffolds of mitragynine or 7-hydroxymitragynine were used in scientific research to develop novel mitragynine pseudoindoxyl, MGM–15, and MGM–16. The first mention of mitragynine pseudoindoxyl in scientific literature dates to 1974 when mitragynine pseudoindoxyl was isolated as a metabolite from bio-transformed mitragynine. In 2014, as part of a drug discovery research, MGM–15 and MGM–16 were developed as potent opioid agonists, with potential therapeutic utility for pain.[20]

*Market Emergence and Designer-Drug Patterns*

The first confirmed appearance of mitragynine pseudoindoxyl in consumer products was reported in 2024.[21] The emergence of MGM–15 in commercially available products was in September 2025.[22] The introduction of these substances into the *Mitragyna speciosa* consumer market follows a classic pattern of new designer drugs, where packaging appears like those of designer novel psychoactive substances and are often advertised as "sold strictly for laboratory, botanical, and research purposes only" and "not intended for human consumption." [23] A study on products sold online containing mitragynine pseudoindoxyl showed that of the 51 total products sold online, 35 had an appealing flavor (*e.g.*, various berry, mint, watermelon, pink lemonade, candy apple, grape, citrus, mango, pistachio, and vanilla bean), and 32 of the products had packaging that was formulated using bright colors. Seventy-six percent (39 of 51) of these products were chewable tablets, 18 percent were liquids (9 of 51), and the remaining three were either dried ice cream cones with ice cream (two products) or a chocolate bar (one product).[24] Many of the products typically feature serving sizes that require consumers to split tablets or doses.

*Current Patterns of Use*

Users seek mitragynine pseudoindoxyl and MGM–15 products for their psychoactive effects and products are often advertised as mood enhancers or alternative to prescription opioid analgesics (*see* Factor 5). These products are commonly sold in different product forms, such as powders, tablets, or liquid shots, which is a sharp contrast from the traditional mode of administration of *Mitragyna speciosa*, which was confined to either water decoctions or brewed into tea or chewing of fresh leaves. A review of vendor websites [25] show that these products are explicitly marketed as "potent" and "fast-acting" substances and sold at low prices. For example, mitragynine pseudoindoxyl and MGM–15 tablets are sold in varying fruit flavors and in bright colors, and prices vary from about $2–4 per tablet or $34.99 per pack (single pack and 10-pack bulk). Of great concern to DEA is that the price of these products may facilitate high-frequency and rapid escalation of use. Further, open-source signal detection demonstrates that users are seeking MGM–16 with the intent to abuse.[26]

The shift from natural leaf decoctions of *Mitragyna speciosa* to flavored, standardized, and high-potency semi-synthetic substances suggests an intentional market strategy to maximize consumer appeal and sale of products with rapid onset of effects. The use of "research chemical" labeling, a common tactic to bypass regulatory oversight, for flavored chewable products further demonstrates a pattern to reach a broader consumer demographics.

**Factor 5. Scope, Duration, and Significance of Abuse**

The abuse of mitragynine pseudoindoxyl and MGM–15 is concerning due to their high opioid potency and commercial availability. Mitragynine pseudoindoxyl and MGM–15 products are sold in formulations that facilitate ease of use, bypass the traditional, lower-alkaloid preparation (chewing leaves or drinking tea), and provide a highly potent effect that mimics classical opioids such as morphine.

*Deceptive Branding and Market Infiltration*

Analysis of marketed mitragynine pseudoindoxyl products revealed misleading marketing strategies with claims that the products are "kratom." Available information on vendor website indicates that the concentrated alkaloid products often contain more than one alkaloid with opioid activity (*e.g.*, mitragynine and MGM–15 or 7-hydroxymitragynine and mitragynine pseudoindoxyl). These substance combinations and marketing practices pose significant safety risk to unsuspecting consumers by exposing them to high doses of opioids, and repeated use of opioids can lead to psychological and physical dependence. In fact, data show that chronic use of 7-hydroxymitragynine has sent users to opioid detox clinics and the need for opioid use disorder medication.[27] Furthermore, these products are labeled for "strong mood enhancement" and "analgesic properties." Finally, the presence of these products containing mitragynine pseudoindoxyl and MGM–15 is deeply concerning because the identity, purity, and quality of these products' formulations are uncertain, thus presenting additional safety concerns for unsuspecting users. The potential presence of MGM–16 in designer products would have similar concerns.

A study of products sold as mitragynine pseudoindoxyl over the internet found that the 51 unique products sold online as mitragynine pseudoindoxyl were marketed in child-appealing forms and contained other opioid alkaloids, with limited consumer safety information. The serving size varied and alkaloid concentrations for these marketed products were often higher than those in naturally occurring *Mitragyna speciosa* leaves. The analysis

[19] *Id.* 13;14; Takayama, H., Ishikawa, H., Kurihara, M., Kitajima, M., Aimi, N., Ponglux, D., Koyama, F., Matsumoto, K., Moriyama, T., Yamamoto, L.T., Watanabe, K., Murayama, T., & Horie, S. (2002). Studies on the synthesis and opioid agonistic activities of mitragynine-related indole alkaloids: discovery of opioid agonists structurally different from other opioid ligands. *Journal of Medicinal Chemistry*, 45(9):1949–1956.

[20] *Id.* 13.

[21] Hill, K., Boyer, E.W., Grundmann, O., & Smith, K.E. (2025). De facto opioids: Characterization of novel 7-hydroxymitragynine and mitragynine pseudoindoxyl product marketing. *Drug and Alcohol Dependence*, 272: 112701; Krotulski, A.J.; Denn, M.T., Brower, J.O., Papsun, D.M., & Logan, B.K. (2025). Evaluation of Commercially Available Smoke Shop Products Marketed as "7-Hydroxy Mitragynine" & Related Alkaloids, Center for Forensic Science Research and Education, United States; Vadiei, N., Evoy, K.E., & Grundmann, O. (2025). The Impact of Diverse Kratom Products on Use Patterns, Dependence, and Toxicity. *Current Psychiatry Reports*, 27(10):584–592.

[22] Gour, A., Mukhopadhyay, S., Henderson, A., Awad, A., Seabra, M.A., Pullman, M., Leon, F., Cutler, J.C., McCurdy, C.R., & Sharma A. (2025). From Kratom to Semi-Synthetic Opioids: The Rise and Risks of MGM–15. *Drug Testing and Analysis*, 17(12):2384–2389.

[23] *Id.* 24.

[24] White, C.M., Belcourt, J., & Sedensky, A. (2025). A Descriptive Assessment of Products Containing the Opioid Receptor Stimulator Mitragynine Pseudoindoxyl. *Substance Use & Misuse*, 60(12):1950–1954.

[25] Market Audit of Online Retailers, Jan. 2026.

[26] Can anyone help with the MGM 16 rumors? *r/KratomKornerhttps://www.reddit.com/r/KratomKorner/comments/1kpz2u3/can_anyone_help_with_the_mgm_16_rumors/?rdt=48097.* Accessed April 9, 2026.

[27] Wightman, R.S., & Hu, D. (2025). A Case of 7-OH Mitragynine Use Requiring Inpatient Medically Managed Withdrawal. *Journal of Addiction Medicine*, 10.1097/ADM.0000000000001558. Advance online publication.

revealed that among the products sampled, 71 percent featured a combination of mitragynine pseudoindoxyl and 7-hydroxymitragynine, while 24 percent contained mitragynine pseudoindoxyl only. The remaining 6 percent contained a combination of mitragynine pseudoindoxyl and other hydroxymitragynine forms (8-hydroxymitragynine or 11-hydroxymitragynine).[28]

*National E-Commerce*

Data from online sources show that the availability of mitragynine pseudoindoxyl and MGM–15 are not isolated to a single region but have rapidly spread across the United States. Products containing mitragynine pseudoindoxyl and MGM–15 are sold on the internet and are delivered to most states where there are currently no kratom use restrictions, suggesting a national distribution network facilitated by online sales and mass-market retail channels. The significance of the abuse of mitragynine pseudoindoxyl and MGM–15 is underscored by the potent opioid pharmacological profile of these substances and the specific health warnings acknowledged even by those who are marketing the substances. Vendor descriptions listed below provide insight into the duration and pattern of use that characterizes the abuse of these compounds:

*Sustained Effect:* The duration of effects is reported to last ''several hours.''[29] This prolonged duration increases the likelihood of cumulative effects and potential for toxicity if doses are repeated.

*Deceptive Marketing for Medical Conditions:* Despite having no FDA-approved medical use, these products are explicitly marketed for ''easing stress and tension,'' ''internal calm and reduced restlessness,'' and providing ''mental clarity.''[30] This marketing encourages individuals with legitimate medical needs to utilize potent, unlawful opioids as self-treatment.

*Deceptive ''Natural'' Branding:* Vendors frequently frame these substances as ''clean and powerful'' alternatives to traditional kratom. This branding is used to minimize the perceived risk of what are highly potent semi-synthetic opioid agonists.

*Deceptive Safety Profiles:* While products are marketed as a ''midday stress relief'' or ''mental reset,'' the inclusion of warnings for lethal respiratory depression on retail sites confirms that the products possess a toxicity profile identical to scheduled opioids.

*Low Barrier to Entry:* The use of ''fruity'' flavors and ''chewable'' formats (*e.g.,* Fruity Perks) suggests an effort to appeal to a broader, potentially younger demographic, significantly increasing the scope of potential abuse.

*Forensic Surveillance and Identification*

According to the National Forensic Laboratory Information System (NFLIS)[31] database, which collects drug identification results from drug cases submitted to and analyzed by Federal State and local forensic laboratories, there have been 19 reports of mitragynine pseudoindoxyl in Arkansas (n = 15), New York (n = 1), Ohio (n = 1), and Wyoming (n = 2) (queried June 23, 2026). Monographs[32] by the Center for Forensic Science Research and Education (CFSRE) report that mitragynine pseudoindoxyl (n > 10) and MGM–15 (n = 2) were detected in at least 12 drug materials. MGM–15 was detected as a tan solid drug that originated from New England, and those involving mitragynine pseudoindoxyl (pills and tablets) initially originated from Pennsylvania and Illinois. Furthermore, a CFSRE[33] trend report identified mitragynine pseudoindoxyl in 103 toxicology specimens and 12 drug materials; similarly, MGM–15 appeared in 21 toxicology specimens and 3 drug materials. This surge in prevalence is underscored by law enforcement action, including a federal and local authorities raid on a Florida-based business distributing 7-hydroxymitragynine and MGM–15 products.

The paucity or lack of seizure data for some of these 7-hydroxymitragynine-related substances as reported in forensic laboratories casework may be due to lack of readily available analytical reference standards and other analytic challenges. Because these are new substances, it often takes time for forensic laboratories to develop and validate the necessary testing methods required for substance identification. Specifically, mitragynine pseudoindoxyl is an oxidative metabolite of 7-hydroxymitragynine, and such closely related compounds require specific method and instrumentation for accurate identification. Also, as these 7-hydroxymitragynine-related substances are not federally controlled under the CSA, some forensic laboratories may not analyze and track encounters of non-controlled substances, and thus reporting could be limited.

The population likely to abuse mitragynine pseudoindoxyl, MGM–15, and MGM–16 appear to be the same as those abusing *Mitragyna speciosa* and prescription opioid analgesics. According to data from the National Survey on Drug Use and Health (NSDUH),[34] as of 2021, an estimated 1.7 million people aged 12 years or older used kratom in the past year. The highest users were among adults aged 26 or older (1.4 million people). The analysis of 2019 NSDUH survey data showed that kratom users are predominately non-Hispanic White and male. The survey finding also revealed a link between kratom use and substance use disorder, particularly

[28] Wilson, L.L., Chakraborty, S., Eans, S.O., Cirino, T.J., Stacy, H.M., Simons, C.A., Uprety, R., Majumdar, S., & McLaughlin, J.P. (2021). Kratom Alkaloids, Natural and Semi-Synthetic, Show Less Physical Dependence and Ameliorate Opioid Withdrawal. *Cell Mol Neurobiol.*, 41(5):1131–1143, doi: 10.1007/s10571–020–01034–7.

[29] *See* Pseudoindoxyl Chewable Tablets—Red Vein—Advanced Alkaloids Descriptions, *https://cbdamericanshaman.com/pseudoindoxyl-chewable-tablets-red-vein-advanced-alkaloids.* Accessed January 2026.

[30] *See* Dozo Perks Extremely Potent Pseudoindoxyl Chewable Tablet Grape 100mg Per Tablet, *https://pureleafkratom.com/products/dozo-perks-100mg-pseudoindoxyl-grape-chewable-tablets-4ct.html.* Accessed January 2026.

[31] NFLIS represents an important resource in monitoring illicit drug trafficking, including the diversion of legally manufactured pharmaceuticals into illegal markets. NFLIS-Drug is a comprehensive information system that includes data from forensic laboratories that handle the nation's drug analysis cases. NFLIS-Drug participation rate, defined as the percentage of the national drug caseload represented by laboratories that have joined NFLIS, is currently 98.5 percent. NFLIS includes drug chemistry results from completed analyses only. While NFLIS data is not direct evidence of abuse, it can lead to an inference that a drug has been diverted and abused. *See Schedules of Controlled Substances: Placement of Carisoprodol Into Schedule IV*, 76 FR 77330, 77332 (Dec. 12, 2011). NFLIS data was queried on March 25, 2026.

[32] *https://www.cfsre.org/nps-discovery/monographs/mitragynine-pseudoindoxyl.* Report Date—November 7, 2025. Accessed January 9, 2026; *https://www.cfsre.org/nps-discovery/monographs/dihydro-7-hydroxy-mitragynine.* Report Date—November 11, 2025. Accessed January 9, 2026.

[33] *https://www.cfsre.org/images/trendreports/2026_Q1_CFSRE_NPS_Discovery_Trend_Reports.pdf.* Quarter 1, 2026 Trend reports. Accessed May 7, 2026.

[34] The NSDUH, formerly known as the National Household Survey on Drug Abuse (NHSDA), is conducted annually by the Department of Health and Human Services Substance Abuse and Mental Health Services Administration (SAMHSA). It is the primary source of estimates of the prevalence and incidence of nonmedical use of pharmaceutical drugs, illicit drugs, alcohol, and tobacco use in the United States. The survey is based on a nationally representative sample of the civilian, non-institutionalized population 12 years of age and older. The survey excludes homeless people who do not use shelters, active military personnel, and residents of institutional group quarters such as jails and hospitals. The NSDUH provides yearly national and state level estimates of drug abuse, and includes prevalence estimates by lifetime (*i.e.*, ever used), past year, and past month abuse or dependence.

nonmedical prescription opioid use disorder, indicative of a strong trend of use for self-managing opioid dependence.[35] By 2022, the prevalence of people who reported past year kratom use had increased to 1.9 million.[36]

**Factor 6. What, If Any, Risk There Is to Public Health**

Mitragynine pseudoindoxyl, MGM–15, and MGM–16 function as potent MOR agonists. This mechanism of action is inherently associated with high potential of abuse, physical dependence, and psychological dependence, consistent with the effects of controlled schedule I and II opioid substances. As of early 2026, mitragynine pseudoindoxyl and MGM–15 products are sold in smoke shops, gas stations, and through numerous online marketplaces, often positioned alongside dietary supplements, which mask their potent opioid nature. Data from preclinical studies demonstrate that mitragynine pseudoindoxyl is about 100 times more potent than mitragynine at the MOR, and MGM–15 and MGM–16 are about 50 and 240 times more potent than morphine in animal models, respectively.[37] Because of the potency of these compounds, they can be abused in smaller, concentrated doses. It has been demonstrated that mitragynine pseudoindoxyl may cause development of signs of opioid physical dependence after chronic use in rodents. Pre-clinical studies demonstrated that chronic twice-daily administration of mitragynine pseudoindoxyl in rodents induces signs of opioid physical dependence and withdrawal symptoms in morphine addiction rodent models as evidenced by increased diarrhea, jumping, and rearing frequency occurring when naloxone was administered or when treatment with this alkaloid was tapered.[38]

These products are easily accessible in retail environments often with no age restrictions, amplifying public health concerns, particularly to vulnerable populations. Vendor descriptions provide insight into the public health threat posed by the abuse of these compounds:

*Rapid Onset:* Marketing materials for mitragynine pseudoindoxyl products emphasize a "quick onset," typically occurring within 10 to 60 minutes, often described as a "wave of calm clarity," "dual-action formula featuring 100mg per piece for maximum potency and a fast-acting hit."[39]

*Sustained Effect:* The duration of effects is reported to last "several hours."[40] This prolonged duration increases the likelihood of cumulative effects and potential for toxicity if doses are repeated.

*Potency Information:* Marketing information of an MGM–15 product indicates the products contain a very large amount of MGM–15 "105 mg total per bottle,"[41] which, given its extreme opioid potency, presents a significant threat to public health.

*Opioid Receptor Activation:* Marketing materials explicitly state that these compounds directly activate opioid receptors and are "full agonist at mu receptors," providing effects that mirror analgesic and stimulant effects (pain relief and mood enhancement).[42]

*Acknowledgment of Severe Risks:* Notably, vendors acknowledge significant public health risks, advising users to monitor for "habit-forming behavior," "high euphoria," "dependence," "overdose," and "death."[43] The mention of overdose and death is a significant indicator of the hazard these substances pose.

As with any MOR agonist, the potential health and safety risks for users of 7-hydroxymitragynine-related substances are high. Mitragynine pseudoindoxyl, MGM–15, and MGM–16 abuse carry a high risk of cardiotoxicity, hepatic and renal toxicity, respiratory depression, neurological effects, and physical dependence and withdrawal. According to data from poison control centers, from January to July 2025, there have been 1,690 exposure calls involving kratom, a significant increase from 2024 exposure calls. A recent CDC morbidity and mortality weekly report (MMWR) notes the marked surge in calls related to kratom exposure to poison centers by over 1,200% between 2015 (n = 258) and 2025 (n = 3,434). The MMWR notes that United States poison centers received a total of 14,449 kratom exposure reports during the past 11 years.[44]

According to data from DEA Toxicology Testing Program (DEA TOX),[45] between February 2025–May 2026, mitragynine pseudoindoxyl has been identified in at least 56 overdose cases, of which 48 were fatal events. From February through April 2026, DEA TOX detected MGM–15 in 17 overdose cases, 16 resulting from a fatal event.

A recent clinical case report[46] highlights the severe acute risks associated with mitragynine pseudoindoxyl consumption. A 34-year-old male escalated from powdered kratom use to 7-hydroxymitragynine tablets and then to mitragynine pseudoindoxyl tablets, eventually consuming nine 20 mg doses daily (including one to two nocturnal doses). The individual attempted to reduce dose and frequency of use but was

[35] Palamar, J. J. (2021). Past-Year Kratom Use in the U.S.: Estimates From a Nationally Representative Sample. *Am J Prev Med.*, 61(2):240–245; Rogers, J. M., Smith, K. E., Strickland, J. C., & Epstein, D. H. (2021). Kratom Use in the US: Both a Regional Phenomenon and a White Middle-Class Phenomenon? Evidence From NSDUH 2019 and an Online Convenience Sample. *Frontiers in Pharmacology*, 12:789075.

[36] *https://www.samhsa.gov/data/sites/default/files/reports/rpt42728/NSDUHDetailedTabs2022/NSDUHDetailedTabs2022/NSDUHDetTabs8-21to8-23pe2022.pdf*. Accessed April 2, 2026.

[37] Matsumoto, K., Narita, M., Muramatsu, N., Nakayama, T., Misawa, K., Kitajima, M., Tashima, K., Devi, L.A., Suzuki, T., Takayama, H., & Horie, S. (2014). Orally active opioid μ/δ dual agonist MGM–16, a derivative of the indole alkaloid mitragynine, exhibits potent antiallodynic effect on neuropathic pain in mice. *The Journal of Pharmacology and Experimental Therapeutics*, 348(3):383–392; Yamamoto, L.T., Horie, S., Takayama, H., Aimi, N., Sakai, S., Yano, S., Shan, J., Pang, P.K., Ponglux, D., & Watanabe, K. (1999). Opioid receptor agonistic characteristics of mitragynine pseudoindoxyl in comparison with mitragynine derived from Thai medicinal plant Mitragyna speciosa. *General Pharmacology*, 33(1):73–81; Váradi, A., Marrone, G.F., Palmer, T.C., Narayan, A., Szabó, M.R., Le Rouzic, V., Grinnell, S.G., Subrath, J.J., Warner, E., Kalra, S., Hunkele, A., Pagirsky, J., Eans, S.O., Medina, J.M., Xu, J., Pan, Y.X., Borics, A., Pasternak, G.W., McLaughlin, J.P., & Majumdar, S. (2016). Mitragynine/Corynantheidine Pseudoindoxyls As Opioid Analgesics with Mu Agonism and Delta Antagonism, Which Do Not Recruit β-Arrestin-2. *Journal of Medicinal Chemistry*, 59(18):8381–8397.

[38] Wilson, L.L., Chakraborty, S., Eans, S.O, Cirino, T.J., Stacy, H.M., & Simons, C.A., Uprety, R., Majumdar, S., & McLaughlin, J.P. (2021). Kratom Alkaloids, Natural and Semi-Synthetic, Show Less Physical Dependence and Ameliorate Opioid Withdrawal. *Cell Mol Neurobiol.*, 41(5):1131–1143.

[39] See Kama Kratom *https://greatcbdshop.com/product-category/brands/kama-kratom/* and Pure Leaf Kratom *https://pureleafkratom.com/kama-kratom/*. Accessed March 2026. (Web content subsequently modified or removed; hardcopy preserved in DEA administrative record).

[40] *Id.* 26.

[41] MGM–15 | 7 count—15mg tablets (105mg total)—Can Vertex Bioscience Accessed March 2026. (Web content subsequently modified or removed; hardcopy preserved in DEA administrative record).

[42] *Id.*

[43] *Id;* See 7–OHFactory30mg MGM–15 Tablets—Berries. *https://www.7ohfactory.com/products/30mg-mgm-15-tablets-berries*. Accessed March 2026. (Web content subsequently modified or removed; hardcopy preserved in DEA administrative record).

[44] Towers EB, Thomas YT, Holstege CP, Farah R. Increases in Kratom-Related Reports to Poison Centers—National Poison Data System, United States, 2015–2025. MMWR Morb Mortal Wkly Rep 2026;75:139–145.

[45] DEA TOX is a surveillance program that aims to detect novel psychoactive substances in fatal and nonfatal overdose cases within the United States. From these cases, biological samples, as well as drug paraphernalia (on limited occasions), are submitted for analysis by hospitals, medical examiners, poison centers, and law enforcement nationwide. Query date May 15, 2026.

[46] Stanciu C. N. (2026). Severe Early-Onset Withdrawal Following Intentional Use of Mitragynine Pseudoindoxyl: A Case Report and Emerging Clinical Considerations. *Cureus*, *18*(3), e105224.

unsuccessful due to withdrawal characterized as ''crawling out of skin symptom.'' [47] The patient presented with a clinical opiate withdrawal scale score of 31 (categorized as severe), alongside autonomic instability, including hypertension, tachycardia, and physical symptoms (such as severe body aches, tremors, diaphoresis, gastrointestinal distress and chills). The patient required supportive management (clonidine, hydroxyzine, gabapentin, loperamide, and antiemetics) over a 72–96-hour period. In addition, on days 5 and 6, the patient was administered naltrexone depot (Vivitrol) injection.

The sale of products with a combination of high-potency opioids, explicit marketing for medical ailments, and the acknowledged potential for life-threatening respiratory depression and addiction highlights the danger posed by mitragynine pseudoindoxyl and MGM–15. While mitragynine pseudoindoxyl and MGM–15 have already been identified in fatal toxicological screening, the pharmacological profile of MGM–16 presents a significant health risk. As previously mentioned, MGM–16 is an opioid agonist with approximately 240-times the antinociceptive potency of morphine in animal studies. Recent online surveillance of a vendor site [48] lists MGM–16 for upcoming sale. This transition from a research grade chemical to an accessible consumer product, combined with its opioid mechanism of action, underscores its potential as a highly attractive but lethal substitute. Thus, to schedule MGM–15 without MGM–16 would create a regulatory loophole that manufacturers are already poised to exploit. Its inclusion is necessary to prevent a market shift toward an even more potent derivative that poses a significant risk of respiratory depression.

**Finding of Necessity of Schedule I Placement To Avoid Imminent Hazard to Public Safety**

In accordance with 21 U.S.C. 811(h)(3), based on the available data and information summarized above, the uncontrolled manufacture, distribution, reverse distribution, importation, exportation, conduct of research and chemical analysis, possession, and abuse of mitragynine pseudoindoxyl, MGM–15, and MGM–16 pose an imminent hazard to public safety. DEA is not aware of any currently accepted medical uses for mitragynine pseudoindoxyl, MGM–15, and MGM–16 in the United States. A substance meeting the statutory requirements for temporary scheduling, found in 21 U.S.C. 811(h)(1), may only be placed in schedule I. Substances in schedule I are those that have a high potential for abuse, no currently accepted medical use in treatment in the United States, and a lack of accepted safety for use under medical supervision. Available data and information for mitragynine pseudoindoxyl, MGM–15, and MGM–16 indicate that these substances have a high potential for abuse, no currently accepted medical use in treatment in the United States, and a lack of accepted safety for use under medical supervision.

As required by 21 U.S.C. 811(h)(4), the Administrator notified the Assistant Secretary, via letter dated December 15, 2025, of DEA's intention to temporarily place mitragynine pseudoindoxyl, MGM–15, and MGM–16 in schedule I. In a letter dated January 20, 2026, the Assistant Secretary for Health stated that HHS had no objection to the temporary placement of these substances in schedule I. DEA subsequently published this NOI in the **Federal Register** on July 6, 2026.[49]

**Conclusion**

In accordance with 21 U.S.C. 811(h)(1) and (3), the Administrator considered available data and information, herein set forth the grounds for his determination that it is necessary to temporarily schedule mitragynine pseudoindoxyl, MGM–15, and MGM–16 in schedule I of the CSA, and finds that placement of these substances in schedule I of the CSA is necessary in order to avoid an imminent hazard to the public's safety.

The temporary placement of mitragynine pseudoindoxyl, MGM–15, and MGM–16 in schedule I of the CSA will take effect on the date the order is published in the **Federal Register** and will remain in effect for two years, with a possible extension of one year, pending completion of the regular (permanent) scheduling process.[50]

The CSA sets forth specific criteria for scheduling drugs or other substances. Permanent scheduling actions in accordance with 21 U.S.C. 811(a) are subject to formal rulemaking procedures ''on the record after opportunity for a hearing'' conducted pursuant to the provisions of 5 U.S.C. 556 and 557.[51] The permanent scheduling process of formal rulemaking affords interested parties appropriate process and the government any additional relevant information needed to make a determination. Final decisions that conclude the permanent scheduling process of formal rulemaking are subject to judicial review.[52] Temporary scheduling orders are not subject to judicial review.[53]

**Requirements for Handling**

Upon the effective date of this temporary order, mitragynine pseudoindoxyl, MGM–15, and MGM–16 will be subject to the regulatory controls and administrative, civil, and criminal sanctions applicable to the manufacture, distribution, reverse distribution, importation, exportation, possession of, and engagement in research and conduct of instructional activities or chemical analysis with, schedule I controlled substances, including but not limited to the following:

1. *Registration.* Any person who handles (possesses, manufactures, distributes, reverse distributes, imports, exports, engages in research, or conducts instructional activities or chemical analysis with) or desires to handle, mitragynine pseudoindoxyl, MGM–15, and MGM–16 must be registered with DEA to conduct such activities, pursuant to 21 U.S.C. 822, 823, 957, and 958, and in accordance with 21 CFR parts 1301 and 1312, as of August 26, 2026. Any person who currently handles mitragynine pseudoindoxyl, MGM–15, and MGM–16 and is not registered with DEA to conduct research with a schedule I controlled substance must submit an application for registration and may not continue to handle mitragynine pseudoindoxyl, MGM–15, and MGM–16 as of August 26, 2026, unless DEA has approved that application for registration pursuant to 21 U.S.C. 822, 823, 957, and 958, and in accordance with 21 CFR parts 1301 and 1312.

Notwithstanding the foregoing, pursuant to 21 U.S.C. 822(h), if, on August 26, 2026, a person is conducting research on mitragynine pseudoindoxyl, MGM–15, and MGM–16 and is already registered to conduct research with another controlled substance in schedule I, the person may continue to conduct research on mitragynine pseudoindoxyl, MGM–15, and MGM–16 if they submit a completed application for registration or modification of

[47] *Id.*

[48] MGM Series Guide: Science of MGM–15 Alkaloids | Getwell Depot. *https://getwelldepot.com/mgm/*. Accessed April 9, 2026.

[49] *Schedules of Controlled Substances: Temporary Placement of mitragynine pseudoindoxyl, MGM–15, and MGM–16 in Schedule I*, 91 *FR* 40909 (July 6, 2026).

[50] 21 U.S.C. 811(h)(1) and (2).

[51] 21 U.S.C. 811.

[52] 21 U.S.C. 877.

[53] 21 U.S.C. 811(h)(6).

existing registration, as applicable, to conduct research with mitragynine pseudoindoxyl, MGM–15, and MGM–16 not later than 90 calendar days after August 26, 2026. The person may continue to conduct such research until the person withdraws the application or the Administrator serves on the person an order to show cause proposing denial of the application pursuant to 21 U.S.C. 824(c) and in accordance with 21 CFR 1301.37. If the Administrator serves an order to show cause proposing denial of the application or modification, the person may not continue to conduct research with mitragynine pseudoindoxyl, MGM–15, and MGM–16 and may not receive or otherwise obtain additional mitragynine pseudoindoxyl, MGM–15, and MGM–16. If an order to show cause is served and the person requests a hearing in accordance with 21 CFR 1301.37(d), the hearing shall be held in accordance with 21 CFR 1301.41–1301.46 on an expedited basis and not later than 45 calendar days after the request is made, except that the hearing may be held at a later time if so requested by the person. If the person sends a copy of the application to a manufacturer or distributor of mitragynine pseudoindoxyl, MGM–15, and MGM–16, receipt of the copy by the manufacturer or distributor constitutes sufficient evidence that the person is authorized to receive mitragynine pseudoindoxyl, MGM–15, or MGM–16 pursuant to 21 U.S.C. 822(h)(4). Continuation of research under 21 U.S.C. 822(h) does not authorize any other handling (*e.g.,* distribution) of mitragynine pseudoindoxyl, MGM–15, or MGM–16.

Retail sales of schedule I controlled substances to the general public are not allowed under the CSA. Possession of any quantity of mitragynine pseudoindoxyl, MGM–15, or MGM–16 in a manner not authorized by the CSA on or after August 26, 2026 is unlawful, and those in possession of any quantity of mitragynine pseudoindoxyl, MGM–15, and MGM–16 may be subject to prosecution pursuant to the CSA.

2. *Disposal of stocks.* Any person who does not desire or is unable to obtain a schedule I registration to handle mitragynine pseudoindoxyl, MGM–15, or MGM–16 must surrender all currently held quantities of this substance.

3. *Security.* Mitragynine pseudoindoxyl, MGM–15, or MGM–16 is subject to schedule I security requirements and must be handled in accordance with 21 CFR 1301.71–1301.93, as of August 26, 2026.

4. *Labeling and Packaging.* All labels, labeling, and packaging for commercial containers of mitragynine pseudoindoxyl, MGM–15, or MGM–16 must comply with 21 U.S.C. 825 and 958(e) and 21 CFR part 1302. Current DEA registrants will have 30 calendar days from August 26, 2026, to comply with all labeling and packaging requirements.

5. *Inventory.* Every DEA registrant who possesses any quantity of mitragynine pseudoindoxyl, MGM–15, or MGM–16 on the effective date of this order must take an inventory of all stocks of this substance on hand pursuant to 21 U.S.C. 827 and 958, and in accordance with 21 CFR 1304.03, 1304.04, and 1304.11. Current DEA registrants will have 30 calendar days from the effective date of this order to comply with all inventory requirements. After the initial inventory, every DEA registrant must take an inventory of all controlled substances (including mitragynine pseudoindoxyl, MGM–15, and MGM–16) on hand on a biennial basis pursuant to 21 U.S.C. 827 and 958 and in accordance with 21 CFR 1304.03, 1304.04, and 1304.11.

6. *Records.* All DEA registrants must maintain records with respect to mitragynine pseudoindoxyl, MGM–15, and MGM–16 pursuant to 21 U.S.C. 827 and 958(e) and in accordance with 21 CFR parts 1304, 1312, and 1317, and section 1307.11. Current DEA registrants authorized to handle mitragynine pseudoindoxyl, MGM–15, or MGM–16 shall have 30 calendar days from the effective date of this order to comply with all recordkeeping requirements.

7. *Reports.* All DEA registrants must submit reports with respect to mitragynine pseudoindoxyl, MGM–15, and MGM–16 pursuant to 21 U.S.C. 827 and in accordance with 21 CFR parts 1304, 1312, and 1317, and sections 1301.74(c) and 1301.76(b), as of August 26, 2026. Manufacturers and distributors must also submit reports regarding mitragynine pseudoindoxyl, MGM–15, and MGM–16 to the Automation of Reports and Consolidated Order System pursuant to 21 U.S.C. 827 and in accordance with 21 CFR parts 1304 and 1312.

8. *Order Forms.* All DEA registrants who distribute mitragynine pseudoindoxyl, MGM–15, and MGM–16 must comply with order form requirements pursuant to 21 U.S.C. 828 and in accordance with 21 CFR part 1305 as of August 26, 2026.

9. *Importation and Exportation.* All importation and exportation of mitragynine pseudoindoxyl, MGM–15, and MGM–16 must be in compliance with 21 U.S.C. 952, 953, 957, and 958, and in accordance with 21 CFR part 1312 as of August 26, 2026.

10. *Quota.* Only DEA-registered manufacturers may manufacture mitragynine pseudoindoxyl, MGM–15, and MGM–16 in accordance with a quota assigned pursuant to 21 U.S.C. 826 and in accordance with 21 CFR part 1303, as of August 26, 2026.

11. *Liability.* Any activity involving mitragynine pseudoindoxyl, MGM–15, and MGM–16 not authorized by or in violation of the CSA, occurring as of August 26, 2026, is unlawful, and may subject the person to administrative, civil, and/or criminal sanctions.

**Regulatory Analyses**

The CSA provides for expedited temporary scheduling actions where necessary to avoid an imminent hazard to public safety. Under 21 U.S.C. 811(h)(1), the Administrator, as delegated by the Attorney General, may, by order, temporarily schedule substances in schedule I. Such orders may not be issued before the expiration of 30 days from: (1) the publication of a notice in the **Federal Register** of the intent to issue such order and the grounds upon which such order is to be issued, and (2) the date that notice of the proposed temporary scheduling order is transmitted to the Assistant Secretary of HHS, as delegated by the Secretary of HHS.[54]

Inasmuch as section 811(h) directs that temporary scheduling actions be issued by order (as distinct from a rule) and sets forth the procedures by which such orders are to be issued, DEA believes the notice-and-comment requirements of the Administrative Procedure Act (APA) at 5 U.S.C. 553, which are applicable to rulemaking, do not apply to this temporary scheduling order. The APA expressly differentiates between an order and a rule, as it defines an "order" to mean a "final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency *in a matter other than rule making.*"[55] This contrasts with permanent scheduling actions, which are subject to formal rulemaking procedures done "on the record after opportunity for a hearing," and final decisions that conclude the scheduling process and are subject to judicial review.[56] The specific language chosen by Congress indicates its intent that DEA issue *orders* instead of proceeding by rulemaking when temporarily scheduling substances. Given that Congress specifically requires the Administrator (as delegated by the Attorney General) to follow rulemaking

[54] 21 U.S.C. 811(h)(1).

[55] 5 U.S.C. 551(6) (emphasis added).

[56] 21 U.S.C. 811(a) and 877.

procedures for *other* kinds of scheduling actions,[57] it is noteworthy that, in section 811(h)(1), Congress authorized the issuance of temporary scheduling actions by order rather than by rule.

Even assuming that this action is subject to the notice-and-comment requirements of the APA, the Administrator finds that there is good cause to forgo these requirements pursuant to 5 U.S.C. 553(b)(B), as any further delays in the process for issuing temporary scheduling orders would be impracticable and contrary to the public interest given the manifest urgency to avoid an imminent hazard to public safety.

Although DEA believes this temporary scheduling order is not subject to the notice-and-comment requirements of the APA, DEA notes that in accordance with 21 U.S.C. 811(h)(4), the Administrator took into consideration comments submitted by the Assistant Secretary in response to the notice that DEA transmitted to the Assistant Secretary pursuant to such subsection.

Further, DEA believes that this temporary scheduling action is not a "rule" as defined by 5 U.S.C. 601(2), and, accordingly, is not subject to the requirements of the Regulatory Flexibility Act (RFA). The requirements for the preparation of an initial regulatory flexibility analysis in 5 U.S.C. 603(a) are not applicable where, as here, DEA is not required by the APA or any other law to publish a general notice of proposed rulemaking. Therefore, in this instance, since DEA believes this temporary scheduling action is not a "rule," it is not subject to the requirements of the RFA when issuing this temporary action.

In accordance with the principles of Executive Orders (E.O.) 12866 and 13563, this action is not a significant regulatory action. E.O. 12866 directs agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health, and safety effects; distributive impacts; and equity). E.O. 13563 is supplemental to and reaffirms the principles, structures, and definitions governing regulatory review as established in E.O. 12866. Section 3(f) of E.O. 12866 provides the definition of a "significant regulatory action," requiring review by the Office of Management and Budget. Because this is not a rulemaking action, this is not a significant regulatory action as defined in Section 3(f) of E.O. 12866. In addition, DEA scheduling actions are not subject to either E.O. 14192, Unleashing Prosperity Through Deregulation, or E.O. 14294, Fighting Overcriminalization in Federal Regulations.

This action will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with E.O. 13132, it is determined that this action does not have sufficient federalism implications to warrant the preparation of a Federalism Assessment.

**List of Subjects in 21 CFR Part 1308**

Administrative practice and procedure, Drug traffic control, Reporting and recordkeeping requirements.

For the reasons set out above, DEA amends 21 CFR part 1308 as follows:

## PART 1308—SCHEDULES OF CONTROLLED SUBSTANCES

■ 1. The authority citation for part 1308 continues to read as follows:

**Authority:** 21 U.S.C. 811, 812, 871(b), 956(b), unless otherwise noted.

■ 2. In § 1308.11, add paragraphs (h)(89) through (91) to read as follows:

**§ 1308.11 Schedule I.**

* * * * *

(h) * * *

* * * * * * *

(89) Methyl (*E*)-2-((1′*S*,6′*S*,7′S)-6′-ethyl-4-methoxy-3-oxo-3′,5′,6′,7′,8′,8*a*′-hexahydro-2′*H*-spiro[indoline-2,1′-indolizine]-7′-yl)-3-methoxyacrylate (commonly known as mitragynine pseudoindoxyl) including its isomers, esters, ethers, salts, and salts of isomers, esters, and ethers, whenever the existence of such isomers, esters, ethers, and salts is possible. Since nomenclature of this substance is not internationally standardized, compounds of this structure, regardless of numerical designation of atomic positions are covered ........ 9672

(90) Methyl (*E*)-2-((2*S*,3*S*,7*aS*,12*aR*,12*bS*)-3-ethyl-7*a*-hydroxy-8-methoxy-1,2,3,4,6,7,7*a*,12,12*a*,12*b*-decahydroindolo[2,3-*a*]quinolizin-2-yl)-3-methoxyacrylate (commonly known as MGM–15; also known as dihydro-7-hydroxymitragynine) including its isomers, esters, ethers, salts, and salts of isomers, esters, and ethers, whenever the existence of such isomers, esters, ethers, and salts is possible. Since nomenclature of this substance is not internationally standardized, compounds of this structure, regardless of numerical designation of atomic positions are covered ........ 9673

(91) Methyl (*E*)-2-((2*S*,3*S*,7*aS*,12*aR*,12b*S*)-3-ethyl-9-fluoro-7*a*-hydroxy-8- methoxy-1,2,3,4,6,7,7*a*,12,12*a*,12*b*-decahydroindolo[2,3-*a*]quinolizin-2-yl)-3-methoxyacrylate (commonly known as MGM–16; also known as 9-fluoro-dihydro-7-hydroxymitragynine; or 10-fluoro-dihydro-7-hydroxymitragynine (depending on numbering convention)) including its isomers, esters, ethers, salts, and salts of isomers, esters, and ethers, whenever the existence of such isomers, esters, ethers, and salts is possible. Since nomenclature of this substance is not internationally standardized, compounds of this structure, regardless of numerical designation of atomic positions are covered ........ 9674

**Signing Authority**

This document of the Drug Enforcement Administration was signed on August 24, 2026, by DEA Administrator Terrance C. Cole. That document with the original signature and date is maintained by DEA. For administrative purposes only, and in compliance with requirements of the Office of the Federal Register, the undersigned DEA Federal Register Liaison Officer has been authorized to sign and submit the document in electronic format for publication, as an official document of DEA. This administrative process in no way alters the legal effect of this document upon publication in the **Federal Register**.

**Heather Achbach,**

*Federal Register Liaison Officer, Drug Enforcement Administration.*

[FR Doc. 2026–17429 Filed 8–24–26; 4:15 pm]

BILLING CODE P

[57] *See* 21 U.S.C. 811(a).