# EXHIBIT H

**Rahul Gupta, M.D., M.P.H., M.B.A., FACP**
**Former Director, White House Office of National Drug Control Policy**

July 27, 2026

The Honorable Terrance C. "Terry" Cole
Administrator
U.S. Drug Enforcement Administration
Submitted electronically via the applicable rulemaking docket

**Re: Comments on DEA Notice of Intent, "Schedules of Controlled Substances: Temporary Placement of 7-Hydroxymitragynine Above a Specified Threshold in Schedule I," 91 Fed. Reg. 40917 (July 6, 2026), Docket No. DEA-1570; and HHS/OASH Request for Information, "Temporary Placement of 7-Hydroxymitragynine Above a Specified Threshold in Schedule I," 91 Fed. Reg. 41049 (July 6, 2026), Docket No. HHS-OASH-2026-0232.**

Dear Administrator Cole:

I am writing to offer technical comments on the proposed temporary scheduling action addressing 7-hydroxymitragynine above a specified threshold and related mitragynine-derived substances. My comments focus narrowly on how the controlled-substance definitions and thresholds are drafted, because the specific wording will determine whether the rule accomplishes its intended purpose — removing concentrated or chemically manipulated 7-OH products from the market without inadvertently sweeping in ordinary botanical kratom or, conversely, opening a loophole for synthetic opioid products marketed under the kratom label.

The central drafting issue is the distinction between ordinary *Mitragyna speciosa* material, where 7-OH and related compounds occur only in trace or low levels relative to mitragynine, and products in which 7-OH or MP has been isolated, concentrated, chemically converted, or otherwise enhanced. The final rule should make that distinction administrable for regulators, laboratories, manufacturers, retailers, and courts.

## I. Recommended Regulatory Approach

I respectfully recommend that DEA structure the final threshold around two related concepts: (1) whether the material contains naturally derived mitragynine from *Mitragyna speciosa*; and (2) whether the material maintains at least a 100:1 mitragynine to combined 7-OH/MP ratio.

### A. Material containing naturally derived mitragynine

For any material that contains naturally derived mitragynine from *Mitragyna speciosa*, DEA should define the threshold in a way that excludes products whose alkaloid profile has been materially altered from ordinary botanical kratom. The most direct formulation would be:

> A material containing naturally derived mitragynine from *Mitragyna speciosa* should be outside the natural kratom carve out if it fails to maintain at least 100 parts mitragynine for every 1 part of combined 7-hydroxymitragynine and mitragynine pseudoindoxyl, by mass, as determined by a validated analytical method.

Put more simply, a kratom derived product should contain at least 100 times more mitragynine than combined 7-OH and MP. This phrasing avoids confusion about whether the ratio is being expressed as 1:100 or 100:1. The intended ratio is 100:1 mitragynine to combined 7-OH/MP.

DEA may also consider an additional absolute concentration backstop, such as 0.10 percent combined 7-OH/MP, but that threshold should be drafted carefully. Absolute percentage thresholds can be affected by concentration of total botanical alkaloids in teas, extracts, or other preparations. A ratio based standard better distinguishes ordinary botanical alkaloid profiles from selectively enhanced 7-OH or MP products.

If DEA retains an absolute threshold, the rule should specify the unit of analysis and the method of measurement. For weight/weight material, 0.10 percent is equivalent to 1,000 parts per million and 1 milligram per gram. For weight/volume liquids, 0.10 percent is equivalent to 1 milligram per milliliter. Those equivalents should be stated expressly to avoid inconsistent interpretation in enforcement.

**B. Material not containing naturally derived mitragynine**

A different rule should apply to products that contain 7-OH or MP but do not contain naturally derived mitragynine from *Mitragyna speciosa*. The purpose of any kratom related carve out is to avoid sweeping in ordinary botanical kratom. That rationale does not apply where a product contains 7-OH or MP without the principal naturally derived mitragynine matrix.

For that category, DEA should specify that any quantifiable concentration of 7-OH or MP above the validated limit of quantification places the material outside the natural kratom carve out. I recommend using "quantifiable concentration above the validated limit of quantification," rather than "any detectable amount," because detection alone depends on laboratory sensitivity and could produce inconsistent enforcement outcomes.

## II. Rationale

The scientific and regulatory record supports treating ordinary botanical kratom differently from products with artificially elevated 7-OH or MP. Mitragynine is the principal alkaloid in *Mitragyna speciosa*. By contrast, available analytical literature reports 7-OH in natural or post-harvest kratom material only at trace or low levels, and recent analytical work has identified products marketed as kratom extracts with 7-OH concentrations and chromatographic profiles inconsistent with authentic kratom leaf.[12]

That distinction matters for public health and for enforceability. A rule that is too broad could unintentionally capture ordinary botanical kratom or full-spectrum preparations that preserve the relative alkaloid profile of the plant. A rule that is too narrow could permit manufacturers to evade control by adding small amounts of mitragynine to otherwise concentrated 7-OH or MP products and labeling them as kratom.

A 100:1 mitragynine to combined 7-OH/MP ratio helps solve that problem. It is not offered as a claim that every product above or below the threshold has a particular pharmacological effect. Rather, it is an administrable screening standard that separates materials retaining a botanical alkaloid profile from products whose composition has been materially altered toward concentrated opioid-active constituents.

This approach is also consistent with the direction recently taken by Florida. In its emergency action addressing 7-OH and related compounds, the Florida Attorney General described a rule requiring any product

---

[1] Paula N Brown, Michael Chan, Xiaohui Zhang, Thomas Brendler, Elevated 7-Hydroxymitragynine Levels Found in Products Misbranded as Kratom, Journal of AOAC INTERNATIONAL, Volume 109, Issue 1, January-February 2026, Pages 124–130.

[2] Lydecker AG, Sharma A, McCurdy CR, Avery BA, Babu KM, Boyer EW. Suspected Adulteration of Commercial Kratom Products with 7-Hydroxymitragynine. J Med Toxicol. 2016 Dec;12(4):341-349. doi: 10.1007/s13181-016-0588-y. Epub 2016 Oct 17.

containing 7-OH or related compounds to contain at least 100 times more regular mitragynine by mass.[3] I previously recommended a similar 100:1 mitragynine to 7-OH approach in comments submitted to the Florida Attorney General.[4] Florida's action is not binding on DEA, but it is useful corroboration that a mass ratio framework is understandable, administrable, and responsive to the same public-health problem.

## III. Additional Drafting Considerations

**A. Define the unit of analysis**

DEA should define the term "article" or otherwise specify the unit of analysis. If the rule is applied per package, per serving, per capsule, per bottle, per extract batch, or per finished product, the practical outcomes could differ substantially. That ambiguity matters both for legitimate botanical products and for synthetic or chemically manipulated products that could be formulated to exploit uncertainty in the rule.

The final rule should therefore state whether thresholds apply to the finished consumer product, each serving unit, each discrete dosage form, or the tested batch or lot. The rule should also specify whether testing is conducted on a dry weight basis, wet weight basis, weight/volume basis, or another defined analytical basis.

**B. Use validated analytical methods**

The final rule should require threshold determinations to be made by a validated analytical method and should specify that enforcement determinations are based on quantifiable concentrations above a validated limit of quantification. Validated methods are especially important here because the difference between trace botanical occurrence and chemically enhanced 7-OH/MP products may determine whether Schedule I enforcement applies.[5]

**C. Address teas and full-spectrum extracts**

DEA should be careful not to treat every concentration process as evidence of chemical manipulation. In natural kratom tea or full spectrum extract, plant matter may be removed while the relative alkaloid profile remains substantially preserved. The regulatory concern should be selective concentration, chemical conversion, isolation, or addition of 7-OH or MP, not ordinary preparation methods that maintain the botanical alkaloid relationship.

Accordingly, the 100:1 mitragynine to combined 7-OH/MP ratio is especially useful for teas and extracts because it focuses on relative alkaloid composition, not simply the fact that a preparation is more concentrated than raw leaf powder.

## IV. Conclusion

DEA's final rule should target the products that present the central public health risk: concentrated, chemically manipulated, isolated, or synthetic 7-OH and MP products marketed as or alongside kratom. At the same time,

---

[3] Attorney General James Uthmeier, Attorney General James Uthmeier Signs Emergency Rule Immediately Scheduling Dangerous 7-OH and Related Compounds as Schedule I Controlled Substances (Fla. Office of the Attorney General, June 2026) (describing a requirement that any product containing 7-OH or related compounds contain at least 100 times more regular mitragynine by mass).

[4] Letter from Rahul Gupta, M.D., M.P.H., M.B.A., FACP, former Director, White House Office of National Drug Control Policy, to Attorney General James Uthmeier, Florida Office of the Attorney General (June 2026) (recommending a mitragynine-to-7-OH mass-ratio approach, including a 100:1 formulation, to distinguish ordinary kratom from concentrated 7-OH products).

[5] Brown PN, Chan M, Zhang X, Brendler T. Elevated 7-Hydroxymitragynine Levels Found in Products Misbranded as Kratom. J AOAC Int. 2026 Jan 1;109(1):124-130. (using AOAC Official Method 2017.14 to quantify mitragynine and 7-hydroxymitragynine and to compare chromatographic profiles with authentic kratom leaf materials).

the rule should avoid unintentionally sweeping in ordinary botanical kratom or full spectrum preparations that preserve the plant's relative alkaloid profile.

I respectfully recommend that DEA consider structuring the final rule around a clear 100:1 mitragynine to combined 7-OH/MP standard: a kratom-derived material should contain at least 100 parts mitragynine for every 1 part of combined 7-OH and MP, as determined by a validated analytical method. For materials that do not contain naturally derived mitragynine, any quantifiable 7-OH or MP should fall outside the natural kratom carve out. DEA should also define the applicable unit of analysis, state the relevant concentration equivalents, and use validated analytical methods and limits of quantification.

This approach would preserve the core objective of the emergency scheduling action while reducing the risk of overbreadth, underinclusion, and inconsistent enforcement.

Respectfully submitted,

Rahul Gupta, M.D., M.P.H., M.B.A., FACP
Former Director, White House Office of National Drug Control Policy