# EXHIBIT I

PinneyAssociates

July 31, 2026

Admiral Brian Christine, MD
Office of the Assistant Secretary for Health
Department of Health and Human Services
200 Independence Ave SW
Washington, DC 20024
Via regulations.gov

cc:
Drug Enforcement Administration
National Institute on Drug Abuse
National Institute on Alcohol Abuse and Alcoholism

**Re: OASH Request for Information Temporary Placement of 7-Hydroxymitragynine Above a Specified Threshold in Schedule I (Docket No. HHS-OASH-2026-0232)**

To Assistant Secretary for Health, Department of Health and Human Services:

Pinney Associates appreciates the opportunity to comment on the Office of the Assistant Secretary for Health (OASH) Request for Information (RFI): Temporary Placement of 7-Hydroxymitragynine (7-OH) Above a Specified Threshold in Schedule I (HHS-OASH-2026-0232).

Our comments take into consideration additional information from the two notices of intent (NOIs) from the Drug Enforcement Administration (DEA) which were also published in the Federal Register on Monday, July 6, 2026, addressing scheduling of 7-OH (Docket No. DEA-1570) and mitragynine pseudoindoxyl (MGPI), MGM-15 and MGM-16 (Docket No. DEA-1644).

Our comment also addresses the fact that MGPI may be detected at low levels in kratom products in which there is no evidence of deliberate adulteration. Additionally, we comment on MGM-15 and MGM-16, which appear to only occur by deliberate chemical synthesis.

Through Pinney Associates the authors consult on pharmaceutical drug development and regulatory submissions to the Food and Drug Administration (FDA) on a broad range of central nervous system (CNS)-active substances and drug products such as psychedelic substances, new chemical entities, and alternative formulations and routes of delivery, and the development and regulation of potential dietary ingredients and supplements including kratom-derived dietary supplements for developers Della Terra and, in 2024, Botanic Tonics (the latter uncompensated). Our work includes abuse potential assessments for New Drug Applications (NDAs), Eight-Factor Analyses (8FAs) to guide controlled substance scheduling recommendations, and risk management. Specific to kratom, through Pinney Associates, the authors consult on kratom science and regulatory issues and studies to the American Kratom Association and, in 2025, the

Holistic Alternative Recovery Trust on 7-OH. Through Pinney Associates, Jack Henningfield is also a paid expert witness in litigation related to kratom.

No organization outside of Pinney Associates compensated the authors for preparation of these comments or had input into these comments. These comments are our own and do not represent those of any organization for which we provide or have provided consulting services.

We write these comments as scientists who have evaluated the science, pharmacology, and public health impacts of kratom and its alkaloids for more than a decade, including 8FAs submitted/published in 2016 (Henningfield and Fant, 2016), 2018 (Henningfield, Fant, and Wang, 2018), and 2022 (Henningfield, Wang, and Huestis, 2022), as well as a 7-OH 8FA (Henningfield et al., 2025).

We agree that the proliferation of the substances that are subject to these DEA NOIs deserve the careful attention DEA and HHS have given them, and support their placement in the Controlled Substances Act (CSA). The threshold approach to prevent the unintended and potential adverse public health effect of banning kratom is important and should also be applied to MGPI. We offer the following comments to contribute to appropriate regulation in the interest of the public health.

1. **Pinney Associates supports the scheduling actions proposed by DEA and agrees with the premise of the HHS RFI that input is warranted to guide the threshold approach for 7-OH described by DEA.**

The rapid emergence of concentrated and synthetic 7-OH and other derivatives and analogs of natural kratom over the past several years raises public safety and health concerns that differ materially from the long history of consumption of natural kratom and natural kratom extracts. We commend DEA and HHS for grounding this action in the available pharmacological and epidemiological evidence, and for undertaking it with appropriate urgency. We also commend the National Institute on Drug Abuse (NIDA), which funded much of the research that provides the scientific foundation for these actions.

2. **The threshold approach for 7-OH – which preserves the availability of natural botanical kratom products that have not been adulterated with artificially high levels of alkaloids, whether naturally occurring or chemically synthesized – is in the public interest and should be extended to MGPI.**

We particularly appreciate that the Agencies have adopted a threshold-based approach that will allow natural kratom products that are within the thresholds to continue to be legally available to consumers except in states and jurisdictions where they are not licit. This takes into consideration public health factors (e.g., factors 4, 5 and 6 of the CSA 8FA) as discussed in the 7-OH 8FA that we submitted to the Agencies in September 2025 (Henningfield et al., 2025).

This threshold framework appropriately distinguishes the concentrated and synthetic products that are the subject of these NOIs from natural botanical kratom, in which 7-OH occurs only in de minimis amounts. That distinction is consistent with many scientific studies that were largely supported by NIDA grants and contracts by FDA and DEA, and reflects evidence-based public health policy. However, the threshold approach adopted for 7-OH is not applied to the substances subject to Docket No. DEA-1644. We encourage a similar approach with respect to MGPI, as MGPI has been detected in some natural kratom leaf-based products, particularly in extracts (liquids), but not MGM-15 and MGM-16, which have not been identified as naturally occurring.

The key to the threshold approach is that the levels are sufficiently low as not to pose a threat to public safety or to individual consumers, but not to inadvertently make natural kratom products unlawful, which is not in the interest of public health (see item 6). The general approach proposed by DEA for 7-OH would appear to be similarly appropriate for MGPI but needs greater specificity and guidance as discussed above.

**3. We encourage DEA and HHS to collaborate to clarify the definition of "article".**

While we support the threshold approach, we note that the term "article", as used in the two NOI, is not defined and that ambiguity may affect this threshold's impact on public health, product development, manufacture and labeling, consumer communications, and development of potentially helpful pharmacotherapies based on the substances subject to these NOIs.

For example, does "article" mean serving size and/or the total product package content and number of servings (i.e., the equivalent of 'dose' and doses per package for pharmaceuticals)? How should it be measured and what units should be used in testing and communications, both scientific and consumer?

Note that natural kratom products are diverse in both the U.S. and Southeast Asia and include loose powdered-leaf material, leaf powder that has been encapsulated and compressed into tablets, natural extracts (e.g., large volume in coffee-like beverages as well as small volume such as espresso-type beverages and 'five-hour energy' type beverages). Kratom products are consumed for a variety of reasons and with widely differing product preferences (as well documented in NIDA-supported research).

It is important to be able to differentiate acceptable natural kratom products from those that should not be allowed either because they have been adulterated or because they are synthesized products marketed as 'kratom', with high concentrations of 7-OH,

mitragynine MGPI, MGM-15, and MGM-16, and potentially other substances that will be identified in the future.

The proposed definition of “article” in the DEA NOIs includes:

(A) *Any botanical material of the plant Mitragyna speciosa, also known as kratom, and contains more than 0.050 percentage of 7-hydroxymitragynine on a dry weight basis, or*

(B) *Any alternative article to that described in (A), that is:*

i. *Resulting from synthetic methods and containing 7-hydroxymitragynine present in amounts greater than 0.050 percentage by weight/weight, weight/volume, or volume/volume or greater than 1.00 milligram of 7-hydroxymitragynine in the article, or*

ii. *Material derived from Mitragyna speciosa and further processed to manufacture alternative dosage forms such as extracts, concentrates, processed edibles, or pressed pills, and which may have materials that have been exposed to chemical, thermal, or other methods leading to chemical transformations that result in 7-hydroxymitragynine present in amounts greater than 0.050 percentage by weight/weight, weight/volume, or volume/volume, or greater than 1.00 milligram of 7-hydroxymitragynine in the article*

In this context, if “article” is read to mean any container in which 7-OH, related substances, or intermediates reside at any point in the supply chain (for example, a research or manufacturing vessel) then the 1.00 milligram absolute limit could be crossed even by material of very low concentration, simply as a function of batch volume. The result would be that two materials of identical 7-OH concentration could be treated differently depending only on the size of the container in which they are held.

This is just one example of the varied issues raised by the broad range of ongoing research programs and product development efforts. FDA and DEA should solicit comments from organizations and companies conducting research and product development in order to help minimize foreseeable barriers to research and pharmaceutical innovation that may result from controlling these substances.

As a starting point we therefore encourage DEA to clarify if “article” refers to the finished product in its marketed or consumer-dosed form, rather than to bulk material, intermediates, or containers at earlier points in manufacturing and distribution. A clear definition may help to resolve the potential conflict between regulators, researchers, and sponsors to ensure a consistent basis for determining what is and is not controlled.

**4. We urge HHS and DEA to define the analytical methods to be used in determining whether a product exceeds the defined threshold.**

The threshold approach depends on the ability of laboratories to reliably and consistently measure 7-OH content as well as MGPI, which poses similar issues to 7-OH but was not addressed in the HHS RFI or DEA NOIs.

Whereas the NOI for 7-OH specifies the not to exceed concentration for 7-OH, it does not provide a threshold for MGPI. Thus, kratom products that are not deliberately adulterated but contain trace amounts of GPI, perhaps formed through oxidative reactions during post-harvest handling or packaging, could be deemed unlawful under Schedule I because the CSA controls any amount of a scheduled substance.

We encourage HHS to collaborate with DEA to develop and issue specific guidance on the analytical methods to be used to detect 7-OH, MGPI and other potential substances of concern. This should include sample preparation and extraction procedures, the instrumentation and validated analytical conditions under which testing is to be performed, the reference standards against which measurements are to be made, and the limits of detection and quantification that laboratories are expected to achieve.

Guidance is also needed on which basis of measurement applies to which product form(s). The proposed definition permits expression on a weight/weight, weight/volume, or volume/volume basis, but does not indicate which basis is appropriate for a given article. For liquid products in particular, whether a result is expressed as weight/volume or volume/volume may determine whether the same product falls above or below the threshold. Without uniform methods, defined testing conditions, and a specified basis of measurement, laboratories may reach different conclusions about identical material, which would undermine consistent application of the threshold for regulators, manufacturers, and researchers alike.

**5. We encourage DEA and HHS to avoid a threshold under which concentration alone is treated as determinative.**

We encourage DEA and HHS to consider that concentration alone is an imperfect proxy for risk to public health. Caffeine offers a familiar example: caffeine is consumed across a wide range of concentrations from brewed coffee and tea, to espresso, to concentrated energy shots. These products differ substantially in the amount of caffeine delivered per unit volume but do not necessarily result in different human exposure levels. Labeling and consumer awareness contribute to consumers being able to obtain the levels of caffeine they may need or desire across a broad range of product types. We offer this analogy not to minimize the concerns that prompted these NOIs, which we share, but to encourage care in how the threshold is defined.

This issue is not straightforward, and the examples above are not intended as a model. Rather, this issue warrants discussion with researchers, product developers, and current marketers of natural kratom products, as well as consumers. This need not be resolved

prior to the scheduling action because we agree that highly concentrated 7-OH products warrant temporary scheduling and this action should not be unduly deterred. Furthermore, the general approach proposed by DEA for 7-OH appears to provide a generally satisfactory basis for an interim standard that will mitigate unintended consequences.

6. **Exercise enforcement discretion with respect to individual consumers of 7-OH products.**

Several surveys and NIDA-funded research confirm that some people are presently consuming 7-OH to manage opioid use disorder, chronic pain and other conditions as discussed in our 7-OH 8FA (Henningfield et al. 2025). Individuals who currently use products with substances that are subject to these NOIs will, upon the effective date of scheduling, be exposed to the risk of criminal liability with little advance notice. Consistent with our 2025 8FA of 7-OH, we encourage DEA and the Department of Justice to focus enforcement resources on the manufacture and distribution of concentrated and adulterated products, and to exercise appropriate discretion with respect to individual consumers.

We raise this as a matter of public health. A substantial number of current consumers report using these products as a lifeline in the self-management of pain or of opioid withdrawal. It may take a year or more for surveillance to provide better estimates of their numbers and geographic distribution across the U.S.

Abrupt exposure to criminal liability, without a corresponding pathway to treatment alternatives, carries a foreseeable risk that some of these individuals will turn to the illicit opioid supply, where the risk of fentanyl adulteration and fatal overdose is far greater than that presented by the products subject to the NOIs. An enforcement posture directed at the manufacturers and distributors who created this market would reach the conduct that prompted these NOIs while reducing that risk.

7. **Support 7-OH-specific surveillance, as well as surveillance that addresses MGPI, MGM-15 and MGM-16 and in the future potentially other substances that may adulterate or be represented as “kratom”.**

A recurring limitation in the evidence base available to the Agencies is that most national surveillance systems do not distinguish products with concentrated levels of 7-OH and other substances that are subject to these two NOIs from traditional botanical kratom, instead aggregating both under a single kratom category. This limitation creates difficulties in distinguishing harms specific to concentrated products from those associated with natural kratom use, which in turn complicates accurate interpretation of data and the design of a proportionate policy response.

We encourage DEA, in coordination with HHS, Centers for Disease Control and Prevention (CDC), Substance Abuse and Mental Health Services Administration (SAMHSA), and NIDA, to support the addition of 7-OH-specific and derivative-specific identifiers to the National Survey on Drug Use and Health (NSDUH), the Researched Abuse, Diversion, and Addiction-Related Surveillance (RADARS) System, the FDA

Adverse Event Reporting System (FAERS), the National Poison Data System (NPDS), and the forensic toxicology and medical examiner data on which DEA itself relies.

**8. Support the transition of consumers into legitimate healthcare channels.**

NIDA-supported research suggests that a meaningful proportion of current 7-OH consumers have arrived at these products through unmet clinical need, particularly for chronic pain and for opioid use disorder. Their reported reasons for use include dissatisfaction with the current healthcare system, in particular the financial costs associated with traditional care and pharmacological treatments. Despite the uncertainty surrounding these products themselves, these individuals' underlying need for care does not disappear when the products are scheduled.

We encourage DEA to work with HHS, CDC, Centers for Medicare & Medicaid Services (CMS), and NIDA to ensure that this action is accompanied by attention to how these consumers will find subsequent care. This includes supporting access to FDA-approved medications for opioid use disorder, preparing clinicians to recognize and manage withdrawal in patients discontinuing these products, and providing clear communication that directs consumers toward treatment options rather than illicit markets. A scheduling action paired with a visible pathway to care could substantially benefit the public health, rather than a plan that removes a product and leaves the underlying demand unaddressed.

**9. Avoid disruptions to legitimate scientific research and product development.**

Several academic researchers, universities, and companies hold 7-OH and related materials in order to conduct legitimate scientific research and product development. Upon the effective date of scheduling, these parties could find themselves suddenly in unlawful possession of Schedule I substances. Many of these parties may not currently hold the registrations or licenses DEA requires, or have in place the physical storage and security measures it mandates for Schedule I substances. Obtaining such registrations and meeting associated security, recordkeeping, and inspection requirements can be costly, and may take six months to over a year to complete.

We encourage DEA to provide clear guidance and appropriate flexibility to meet these legitimate sponsors and investigators where they are, to minimize the potential termination of research and product development efforts already underway, as well as minimizing any delays to research that is planned for initiation, in some cases with approved NIH funding. In some cases, sponsors may be using one or more of the substances subject to these NOIs as starting materials in the development of new pharmaceuticals, and may similarly be required to cease development. We respectfully encourage DEA to consider the following measures:

I. Issue clear guidance addressed to researchers and developers describing what these NOIs require of them, and how to come into compliance.
II. Explore approaches within the CSA or advise as to how the CSA should be amended by Congress to enable expedited review of Schedule I research registrations, and of applications from facilities that already hold DEA

registrations in other schedules, where the applicant is engaged in research or pharmaceutical development.

III. Establish a defined transition period, communicated clearly in advance of the effective date, during which current holders of these materials may register, transfer, or dispose of them without being placed in immediate violation.

IV. Facilitate Investigational New Drug (IND) applications for sponsors developing products based on these substances. HHS has confirmed that there are presently no active INDs or approved New Drug Application (NDAs) for these substances. Preserving a clear route to development is in the public interest, and any product that is ultimately determined to be currently accepted for medical use (typically by FDA approval) would then be rescheduled according to its own demonstrated profile by the CSA's 8FA.

V. Ensure that NIDA-funded and other federally supported research on these substances can continue after scheduling.

We appreciate the Agencies' attention to these questions and would welcome the opportunity to serve as a resource as the threshold determination is finalized.

Please contact Dr. Jack Henningfield (jhenning@pinneyassociates.com) or Daniel Wang (dwang@pinneyassociates.com) at Pinney Associates if you have any questions or need further information, such as publications of research studies on the issues addressed in our comment. The authors can also be reached by phone at 301-718-8440.

Sincerely,

Jack E. Henningfield

Jack E. Henningfield, PhD, Vice President, Research, Health Policy and Abuse Liability

Daniel Wang, Director, Cannabinoids and New Dietary Ingredients

On behalf of Pinney Associates

**REFERENCES**

Henningfield, J. E., & Fant, R. V. (2016). Assessment of kratom under the CSA eight factors and scheduling recommendation [Comment to Docket No. FDA-2018-N-1621-1166]. U.S. Food and Drug Administration. Accessed July 30, 2026 at https://downloads.regulations.gov/FDA-2018-N-1621-1166/attachment_1.pdf

Henningfield, J. E., Fant, R. V., & Wang, D. W. (2018). The abuse potential of kratom according the 8 factors of the controlled substances act: Implications for regulation and research. Psychopharmacology, 235(2), 573–589. https://doi.org/10.1007/s00213-017-4813-4

Henningfield, J. E., Wang, D. W., & Huestis, M. A. (2022). Kratom abuse potential 2021: An updated eight factor analysis. *Frontiers in Pharmacology, 12*, Article 775073. https://doi.org/10.3389/fphar.2021.775073

Henningfield, J. E., Wang, D. W., Sembower, M. A., Pype, S., & Foxon, F. (2025). *The abuse potential of 7-hydroxymitragynine (7-OH) according to the 8 factors of the Controlled Substances Act*. Pinney Associates. Submitted to the Drug Enforcement Administration (DEA), Food and Drug Administration (FDA), and National Institute on Drug Abuse (NIDA). https://www.pinneyassociates.com/wp-content/uploads/2026/03/Henningfield.20250929.The-Abuse-Potential-of-7-Hydroxymitragyine-7-OH-According-to-the-8-Factors-of-the-Controlled-Substances-.pdf